John D. SIBLEY, Plaintiff-Appellant,

v.

The FEDERAL LAND BANK OF NEW ORLEANS, Defendant-Appellee,

and

Board of Commissioners of the Mississippi State Bar, Intervenor-Appellant.

No. 77–1817.

United States Court of Appeals,
Fifth Circuit.

June 20, 1979.

Leslie Darden, Lester F. Sumners, New Albany, Miss., C. Michael Malski, Amory, Miss., for plaintiff-appellant.

Grady F. Tollison, Mary Ann Connell, Oxford, Miss., for defendant-appellee.

Before TUTTLE, TJOFLAT and HILL, Circuit Judges.

TUTTLE, Circuit Judge:

The Federal Land Bank of New Orleans ("Bank") reduced by approximately seventy percent the number of Mississippi attorneys on its list of attorneys approved to conduct loan closings for the Bank. The appellants, an individual attorney and the Commissioners of the Mississippi State Bar, brought this action seeking to enjoin the Bank from cutting down its list. The district court granted summary judgment in favor of the Bank, and we affirm.

I.

The Federal Land Bank of New Orleans is one of twelve such banks chartered by the United States pursuant to the Federal Farm Loan Act of 1916, 39 Stat. 360 (1917), and continued under the Farm Credit Act

of 1971, 12 U.S.C. § 2001 *et seq.* The Bank is part of the nation's Farm Credit System, which includes the federal land bank associations, the federal intermediate credit banks, the production credit associations, and the banks for cooperatives, all under the supervision of the Farm Credit Administration. 12 U.S.C. § 2002; *see generally* 12 C.F.R. ch. VI.

The role of the federal land banks in this system is to make rural real estate loans primarily to farmers and ranchers. This they do through the federal land bank associations, of which there are 34 chartered by the Federal Land Bank of New Orleans. The associations own all the voting stock of the Bank; [1] each subscribes to stock in the Bank in proportion to the amount of the aggregate loans held or applied for by members of the association. 12 U.S.C. § 2013. In turn, when a bank makes a loan to a farmer or rancher, the loan applicant subscribes to stock in the association in an amount between five and ten percent of the full amount of the loan, the exact percentage determined by the Bank. 12 U.S.C. § 2034.

All the funds loaned by the Bank come from its own operations. The Bank lends no government funds and receives no government guarantees of its loans or its obligations.[2] The Bank is governed by a seven person board of directors, two elected by land bank associations, another four elected by other entities in the farm credit system, and a seventh appointed by the Governor of the Farm Credit Administration. 12 U.S.C. § 2223(a).

The Bank's loans for rural real estate are very specifically limited to adequately secured first mortgages. 12 U.S.C. § 2017 requires that "[l]oans shall not exceed 85 per centum of the appraised value of the real estate security, and shall be secured by first liens on interest in real estate of such classes as may be approved by the Farm Credit Administration." *Accord* 12 C.F.R. §§ 600.20 (1977), 614.4230 (1977).[3] The statutes and regulations governing the Bank leave to the Bank the methods for ascertaining that its loans meet these requirements. Nevertheless, they make clear that the responsibility to do so is the Bank's. 12 C.F.R. § 615.5060(a)(1977) provides:

> If the chief counsel for a Federal Land Bank has determined in writing that bank procedures provide sufficient safeguards to assure that a loan made by the bank will be secured by a first lien or its equivalent on interest in the primary real estate security, an attorney lien certification need not be obtained at the time a note is accepted for collateral. The note shall be withdrawn from collateral upon the expiration of one year from the date of loan closing, unless before the end of such period, an attorney has certified that the interest of the bank in the primary real estate security for that loan is a first lien on the borrower's interest or its equivalent from a security standing point.

1. The Governor of the Farm Credit Administration may hold nonvoting stock in the banks. 12 U.S.C. § 2013(d).

2. During the Great Depression, the federal government did play a role in the financing of the federal land banks. The Federal Reserve Bank bought $9.5 million in land bank bonds in 1929, and the federal farm Mortgage Association bought $200 million in land bank bonds between 1934 and 1936. From 1932 to 1937, Congress appropriated direct loans for the banks.

3. 12 C.F.R. § 600.20 states in part:
   The principal function of the Federal land bank is to make first mortgage loans . . to eligible applicants.
   12 C.F.R. § 614.4230(a) states in full:
   Primary security for a Federal land bank shall consist of a first lien on interest in real estate. In the case of nonfarm rural home loans, the primary security shall be a first lien on the rural residence being financed. The real estate interest must be mortgageable interest under deeds or leases which reasonably may be considered adequate to afford the security of a first lien upon the rights and interest on which the loan is predicated. Collateral closely aligned with, an integral part of, and normally sold with real estate may be included in the appraised value of the security upon which a loan is based. Appraised value shall be determined within approved standards and shall include in the evaluation either farmlands, eligible farm-related businesses, or eligible rural residences, whichever is appropriate for the type of loan being made.

Thus, the Bank either may accept an attorney's lien certification or it may rely on its own procedure to fulfil its obligations to loan only on the security of a first lien.

For more than 50 years, the Bank has used outside attorneys to determine whether its interest in a real estate security meets these obligations. During this time, the Bank has maintained a list of attorneys approved to examine and certify title, record instruments, and close loans. The final selection of an attorney from this list for each transaction is made by the loan applicant. The applicant pays the attorney's fee. Originally, the list was selected according to various indicia of reputation, such as the Martindale-Hubbell directory, experience in title examination, and recommendations of Bank personnel and other practitioners.

The list grew over the years so that by 1974 the Bank's list in Alabama, Mississippi and Louisiana contained more than 1400 law firms and an estimated 3,000 to 3,500 attorneys. In Mississippi, there were 556 firms on the list. From 1922 through 1946, attorneys selected from this list would submit abstracts of title which were then reviewed and approved by the Bank's own in-house attorneys, with the outside counsel handling the rest of the closing. Beginning in 1946, the approved outside attorney would submit a certificate of title rather than an abstract. At the time of the changes at issue here, then, the procedure for obtaining a loan from the Bank was as follows. A prospective borrower would apply to the land bank association in his area, paying to the association fees for the appraisal of his real estate security and the investigation of his credit. The applicant would then choose from the Bank's approved list an attorney who would prepare the loan documents, ordinarily printed forms furnished by the Bank, conduct the search, and certify the borrower's title to the real estate security and the first lien status of the Bank's mortgage. Upon such certification, the association would prepare closing statements and issue a draft on the bank. The borrower would pay all closing expenses, as well as the fee charged by the approved attorney.

In 1974, the management of the Bank became concerned about the lapse of time between an application for a loan and the closing of a loan.[4] In an effort to make more efficient the processing of applications, the Bank instituted a new loan closing procedure. This procedure contemplated less involvement by the Bank itself and greater involvement by the land bank associations and local attorneys. As part of this new procedure, the Bank decided to reduce by 70 percent the number of attorneys approved to handle closings. To carry out this decision, the Bank's duly authorized general counsel solicited from the land bank associations under the Bank their views on the attorneys who should remain on the list. Criteria suggested to the association were admittedly subjective. They included the volume of Bank business which attorneys handled, the efficiency with which they handled it, their professional reputations and competence in title practice, as well as association personnel's own preferences. The general counsel made the final decision as to who should remain on the list.

On September 16, 1974, letters went out both to those attorneys who remained on the approved list and to those who were being dropped, informing them of the new procedure, explaining the use for it, and telling them their status. The letters acknowledged that many qualified attorneys were being dropped from the approved list; the letter to the attorneys who remained on the list stated "[m]any of the firms removed from the list are prestigious and composed of highly competent and reputable attorneys. Arbitrary decisions have been made in some instances prompted by our desire to reduce the overall numbers of attorneys involved." As the district court found, nothing said in these letters was

---

**4.** A statistical study furnished by the Farm Credit Administration indicated that Bank's average of 82 days to close a loan ranked 9th among the 12 federal land banks. The fastest bank averaged 54 days.

detrimental to the attorneys dropped from the list. A subsequent letter to the dropped attorneys to "clarify and amplify" the September 16 letter explained more extensively the new procedure. Under the new system, "inputs by, and involvement of, the Bank will be reduced to a minimum [and] [l]oan closing will be handled almost exclusively by association personnel and approved closing attorneys." The second letter also stressed that the decision to drop certain firms and attorneys was not intended as any reflection on those dropped.

Appellant John Sibley was one of the attorneys dropped from the approved list. He filed this action individually and on behalf of all practicing attorneys in Mississippi. Subsequently, the Mississippi State Bar ("Bar") was permitted to intervene on behalf of all Mississippi attorneys,[5] and Sibley amended his complaint to seek only individual relief. The appellants alleged that the Federal Land Bank of New Orleans is a federal instrumentality subject to the due process clause, and that the Bank violated the equal protection component of the due process clause, cf. Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954), by not accepting loan closing services of any Mississippi attorney selected by the borrower. In the alternative, assuming the Bank is not a federal instrumentality with respect to its decision to cut the approved list, they claimed that the action restricted competition among Mississippi attorneys and thus violated the Sherman Act, 15 U.S.C. § 1. After discovery, the parties stipulated that there were no material issues of fact and filed opposing motions for summary judgment. The district court granted summary judgment in favor of the Bank.

## II.

Much of the argument on appeal focuses on the question whether the Bank is a federal instrumentality for the purposes of its decision to cut the list of approved attorneys. On this issue depend the questions whether the Bank is subject to constitutional requirements on one hand, or to the Sherman Act on the other hand. In our view, the crucial issue on this record is whether the attorney selected by the borrower from the Bank's approved list to certify title and conduct the closing represents the borrower or the Bank. Because we agree with the district court that this attorney represents the Bank, we need not decide whether the Bank is a federal agency. The Bank's selection of its own attorneys implicates neither the Constitution nor the Sherman Act.

### A

Analysis of the role played by the outside attorney who handles the loan closing indicates that the attorney's primary duty is to the Bank. By the terms of its statutory and regulatory mandate, "[t]he principal function of the Federal Land Bank is to make first mortgage loans on farm lands. . . . " 12 C.F.R. § 600.20 (1978). It meets this function by lending only where its security is a first lien. To ascertain that its security meets this requirement, the Bank relies on the attorney who certifies title. This reliance on the attorney's exercise of professional judgment and discretion is the essence of a lawyer-client relationship. The Bank's present-day reliance on the outside attorney contrasts with its pre-1946 system of certifying title. There, in-house attorneys of the Bank examined abstracts of title furnished by the outside attorney; it was house counsel's judgment which saw to the Bank's legal obligation. The new loan closing procedure which led to the reduction of the approved attorneys list apparently envisioned even greater reliance on the outside attorney's judgment.

The closing attorney also performs other services for the Bank besides certifying the title: title examination, recordation of the mortgage instruments, and preparation of notes, deeds, financing statements, security

---

5. The Mississippi Bar is created by statute, Miss.Code Ann. § 73–3–101 (1972), and all Mississippi residents admitted to practice are required to be members, Miss.Code Ann. § 73–3–103 (1972).

agreements, and loan agreements. To be sure, these services also provide a benefit to the borrower. And it is the borrower who makes the final selection of an attorney and pays for his services. Nevertheless, it is the reliance on the attorney to fulfill the Bank's legal obligation to take only first liens which distinguishes between services which otherwise benefit the bank and the borrower equally. That the Bank makes only a partial choice of its attorney does not alter that the choice belongs to the Bank. Payment for the attorney's services, the district court found, merely represents an allocation of the costs of the loan. The borrower remains free to hire an attorney to represent his own interests in processing the loan application.[6]

Our view of the attorney-client relationship in the processing of federal land bank loans accords with the prevailing view of the lawyer's responsibility when selected by a borrower from a list approved by the lender. *Florida Bar v. Teitelman*, 261 So.2d 140 (Fla.1972); *Wittenbrock v. Parker*, 102 Cal. 93, 36 P. 374 (1894); *The Proper Role of the Lawyer in Residential Real Estate Transactions: A Report by the Committee on Residential Real Estate Transactions of the ABA* (1944); Op. 98, State Bar of Michigan Committee on Professional & Judicial Ethics (1946).[7]

*Federal Land Bank of New Orleans v. Henderson, Black & Merrill Co.*, 253 Ala. 54, 42 So.2d 829 (1949), is not to the contrary. In that case, the court considered whether the negligence of the attorney who abstracted title to mortgaged property under the Federal Land Bank of New Orleans' pre-1946 system of certifying title should be attributed to the Bank. The court accepted the Bank's contention that it should not because the attorney was the agent of the borrower, not the Bank. Under the Bank's pre-1946 system of ascertaining whether the Bank's security interest was a first lien, the Bank's own in-house attorneys reviewed the abstracts of title furnished by an approved attorney and determined whether the state of the title met the Bank's first lien requirements. Thus, the pre-1946 system lacked the present system's reliance on the outside attorney's judgment. Under these circumstances, we do not think that *Henderson* binds the Bank today.

## B

Our conclusion that the client of the closing attorney is the Bank leaves little to discuss of the appellants' substantive arguments. The appellants' due process claim is that the classification between those lawyers who remained on the approved list and those who did not is irrational in violation of the equal protection component of the due process clause of the fifth amendment.[8] The appellants conceded at oral argument, however, that if the Bank retained a single attorney in each community to do its business, the effect would be no different than where a United States Attorney's office

---

**6.** Perhaps one of the attractions of inclusion on the Bank's list is that it affords the prospect of doing collateral work for the borrower, such as removing clouds on title to make the security eligible for a Bank mortgage. This prospect raises serious ethical problems, however. "The same lawyer can offer different parties title protection, but if he attempts to advise and represent them conflicts of interest arise." *The Proper Role of the Lawyer in Residential Real Estate Transactions: A Report by the Committee on Residential Real Estate Transactions of the ABA* 19 (1944). Thus, the attorney who conducts the closing can only be viewed as representing one party to the transaction. In this case, title protection is a special function for the lender, and so the lender is best viewed as that party.

**7.** The Mississippi Bar points out that the ABA report cited above criticizes the conventional arrangement. The report suggests that the borrower needs the protection more, and, since the lawyer can represent only one party where conflicts arise, the lawyer should represent the borrower. The report recognizes, however, that existing views accept that the lawyer represents the lender.

**8.** Of course, the fifth amendment does not mention "the equal protection of the laws," but equal protection is an element of due process. *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). "Equal Protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley v. Valeo*, 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976).

hires an individual attorney, and the equal protection clause would not be implicated. To distinguish this concession, the appellants seize on the statement in the Bank's September 16, 1974, letter that "[a]rbitrary decisions have been made in some instances prompted by our desire to reduce the overall number of attorneys involved." Even if the attorneys on the list represent the Bank, the appellants argue, where the Bank maintains a list rather than retaining a single attorney, it cannot make such arbitrary and admittedly subjective decisions.

This fails to distinguish the Bank's list from the retainer of a single attorney. The classification which the list creates is simply one between those attorneys retained and those not; there is no allegation that the line drawn is one "directed 'against' any individual or category of persons." *Marshall v. United States*, 414 U.S. 417, 428, 94 S.Ct. 700, 707, 38 L.Ed.2d 618 (1974). As such, it is sufficient that the classification bears some rational relationship to the Bank's objectives.[9] There is also no contention that the Bank's decision to reduce the number of attorneys involved in closings, apart from the means chosen to carry out this decision, was in any way unfounded or constitutionally infirm. We think that, faced with large numbers of attorneys indistinguishably qualified to certify titles and carry out closings for the Bank, an "arbitrary" reduction was a rational means of achieving the desired end. If the Bank is a federal entity for the purposes of its decision to reduce the attorneys who represent it in its closing business, therefore, its reduction of the list of eligible attorneys would not violate due process.

If the Bank is a private entity, the appellants' antitrust claim is precluded by our decision in *Forrest v. Capital Building & Loan Association*, 504 F.2d 891 (5th Cir.

1974), *aff'g* 385 F.Supp. 831 (M.D.La.1973). In that case, we held that two savings and loan associations' practice of requiring their borrowers to pay the legal fees of attorneys which the associations selected to examine and certify title and prepare closing papers for mortgage loans was not tying prohibited by the antitrust laws. Our conclusion that the attorneys on the Federal Land Bank's approved list represent the Bank and not the borrower leaves no room for a distinction between the present case and *Forrest.*

The decision of the district court is AFFIRMED.

---

9. *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 314, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976); *City of New Orleans v. Dukes*, 427 U.S. 297, 303–04, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); *Woods v. Holy Cross Hosp.*, 591 F.2d 1164, 1176 (5th Cir. 1979); *Jackson v. Marine Exploration Co., Inc.*, 583 F.2d 1336, 1346 (5th Cir. 1978). *See id.* at 1346: "To respond to this

argument with more than a few perfunctory cites to decisions such as *Railway Express Agency v. New York*, 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 . . . and *Williamson v. Lee Optical Co.*, [348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563], *supra*, gives it a stature it scarcely deserves."