**John C. AMIS, Jr., et al., Plaintiffs,**

v.

**GULF ABSTRACT & TITLE, INC., et al., Defendants.**

**No. 80-88 Civ-Ft.M-K.**

United States District Court, M.D. Florida, Fort Myers Division.

April 25, 1983.

---

Britt Whitaker, Tampa, Fla., for plaintiffs.

Donald A. Gifford, Shackleford, Farrior, Stallings & Evans, P.A., Tampa, Fla., for Gulf Abstract & Title Co., Inc.

G. Hunter Gibbons, Dickinson, O'Riorden, Gibbons, Quale, Shields & Carlton, P.A., Sarasota, Fla., for Henderson, Franklin, Starnes & Holt.

Charles W. Pittman, Macfarlane, Ferguson, Allison & Kelly, Tampa, Fla., for Lee County Bank.

Richard E. Wolverton, Lyle & Skipper, P.A., St. Petersburg, Fla., for Allen, Knudsen & Schwartz, P.A. and Goldberg, Rubenstein & Buckley, P.A.

William H. Adams, III, Mahoney, Hadlow & Adams, Jacksonville, Fla., for Barnett Bank of Fort Myers.

Sylvia H. Walbolt and Christopher L. Griffin, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, Fla., and Lewis R. Mills, Peper, Martin, Jensen, Maichel & Hetlage, St. Louis, Mo., for First Nat. Bank of Fort Myers.

Preston Moore and Marilyn Holifield, Holland & Knight, Tampa, Fla., for NCNB Nat. Bank of Florida.

## ORDER

KRENTZMAN, Senior District Judge.

This is an antitrust action brought under sections one and two of the Sherman Act, 15 U.S.C. §§ 1, 2 (1976), and under the Florida Antitrust Act, Fla.Stat. Ch. 542 (1981), in which plaintiffs seek damages and injunctive relief under sections four and sixteen of the Clayton Act. 15 U.S.C.A. §§ 15, 26 (Supp.1982). The complaint alleges certain conduct of several of the major banks and law firms in the Fort Myers, Florida area, and describes various theories under which this conduct assertedly violated the antitrust laws. Substantial discovery was conducted, including a great many depositions taken by plaintiffs during 1981 and early 1982. Defendants began filing motions for summary judgment in early 1982, and, with certain specified exceptions, discovery was stayed by order of the Court on June 25, 1982. Plaintiffs were directed to and did respond to the motions for summary judgment, and the Court heard oral argument.

The sad history of this dispute should be briefly stated. Amey, Inc. is a closely held corporation of which John Amis is president. In 1976, Amey contracted to purchase certain real property and approached Lee County Bank to arrange financing. According to plaintiffs, the bank's willingness to make the loan was conditioned upon Amey's agreement "to purchase a real estate title search and opinion" from the defendant Henderson, Franklin, Starnes & Holt, P.A. (Henderson, Franklin), or "to pay $325 for the search and opinion, which would be given by [Henderson, Franklin]." Complaint ¶ 34. Amey agreed, and the bank requested a title opinion from the Henderson, Franklin firm. On October 29, 1976, the firm rendered its preliminary opinion covering the period to and including October 10, 1976. The loan was closed and the property purchased on November 23, 1976, but, unknown to the parties, the In-

ternal Revenue Service had filed a tax lien against the property on November 3, 1976. Neither plaintiffs nor the bank had requested an update on Henderson, Franklin's title opinion. The bank charged Amey, as borrower, the $325 fee it paid to Henderson, Franklin for the title work.

In late 1977, Amey filed an action in state court against Henderson, Franklin and its malpractice insurance carrier, alleging that the firm was negligent in failing to discover the tax lien. The trial court granted the defendants' motion for summary judgment, concluding that the firm owed a duty of care to the bank as its client, but owed no duty to Amey as an alleged third-party beneficiary. That view was upheld on appeal:

> It may be that in transactions such as this the buyer often chooses to rely on the expertise of the lender's lawyer on the premise that the lawyer would not approve the title for a loan unless the title were clear. However, this is a calculated risk, and if it proves to be unfounded, the buyer has no claim that the lawyer violates a duty owed to him .... The fact that the buyer had to pay the law firm's fee did not establish a lawyer-client relationship.

*Amey, Inc. v. Henderson, Franklin, Starnes & Holt, P.A.,* 367 So.2d 633, 635 (Fla.App.), cert. denied, 376 So.2d 68 (Fla.1979).

Amey and Amis filed this action just over a year after the Florida Supreme Court denied certiorari in the state litigation. In count one of their complaint, plaintiffs allege that "defendants and their co-conspirators" engaged in price-fixing by circulating and adhering to a "printed uniform fee schedule for real estate legal services." This conspiracy allegedly injured plaintiffs because of its inflationary effect on the "price for legal services and all mortgage financing" since 1976. Count two contains essentially the same allegations, but is headed "Exchange of Price Information."

Counts three through six contain challenges to the relationships allegedly in effect between each bank and its putative law firm partner. In count three, plaintiffs contend that defendants Lee County Bank and Henderson, Franklin—the two with whom they dealt in 1976—have engaged in an illegal tying arrangement by which all those purchasing mortgage financing from the bank were "required to purchase and pay for title services and title opinions provided by Henderson [, Franklin] at inflated prices." Plaintiffs also complain that this arrangement "foreclose[s]" other attorneys from Lee County Bank's "30% share of the market for commercial legal title work and 20% share of all legal title work and mortgage financing in Lee County;" count four contains the same allegations, but is headed "Exclusive Dealing."[1] Next, plaintiff again challenges the "illegal tying" arrangement between Lee County Bank and Henderson, Franklin, this time suggesting that the relationship contained aspects of resale price maintenance. Finally, in count six, plaintiffs contend that the several law firm-bank relationships result from an agreement among the firms not to advertise or otherwise compete to do work for any bank other than their respective "partner." The banks allegedly also conspired not to deal with any firm other than their

---

1. At best, plaintiffs have only questionable standing to raise this second aspect of the claim in count three and the whole of count four, for if anyone suffered directly from the alleged exclusive dealing arrangement it was other attorneys in the area. *See Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); *cf. Forrest v. Capital Buildings & Loan Ass'n,* 504 F.2d 891 (5th Cir.1974), cert. denied, 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975) (similar practice challenged by lawyers excluded). Moreover, Henderson, Franklin acted as the bank's attorney; plaintiffs paid their fee only because they undertook to do so in negotiations with the bank. These plaintiffs' relationship to the alleged exclusive dealing violation—or to many of the other alleged violations—was therefore even more distant than was the state of Illinois' to the block manufacturers' price-fixing scheme in *Illinois Brick.* Cf. *Amey, Inc. v. Henderson, Franklin,* 367 So.2d 633 (indicating distance between plaintiffs and legal services in question). Because legal insufficiency of the tying and exclusive dealing claims is so well decided, and because the absence of an agreement is so clear on the record, the Court will not rest solely on plaintiffs lack of standing.

respective "partner." In each of these claims, plaintiffs allege injury in that the price for title work has been inflated.

Count seven comprises plaintiffs' claim that the defendant law firms and certain "unnamed co-conspirators" have agreed "without the express approval of the State of Florida to cause the services of real estate title searching and describing and opinions to be included within the definition of 'the practice of law,' as recognized in the State of Florida." Complaint ¶ 88. The alleged effect of this "combination" was "to boycott and refuse to deal and cause the refusal to deal by defendant banks and others with persons who are capable of and would be desirous of performing real estate title searches in competition with defendants in Lee County but who are not members of the Florida Bar." *Id.* ¶ 89.

Finally, counts eight and nine draw all the preceding alleged antitrust violations together and assert that they were the means by which the defendants—banks and firms—sought to monopolize "the practice of real estate legal services and commercial mortgage financing" in Lee County. *Id.* ¶ 92. Count eight alleges monopolization and count nine attempt to monopolize.

## I. *The Statute of Limitations.*

■ The standard to be applied in considering summary judgment on limitations grounds is the familiar one: the motion is to be granted if the pleadings, discovery, and the documentation supporting the motion reveal no "genuine issue of material fact" and indicate "that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A properly supported motion for summary judgment cannot be resisted on mere allegations alone, for such

a motion "pierces" the pleadings and tests whether the factual dispute is "genuine." *Joe Regueira v. American Distilling Co.,* 642 F.2d 826, 829 (5th Cir.1981).

■ An antitrust action must be brought "within four years after the cause of action accrued." 15 U.S.C.A. § 15b (1973 & Supp. 1982).[2] The traditional rule is that an antitrust action accrues when the alleged conspiracy or other antitrust violation has an impact on the plaintiff. "[I]f a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 339, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971).

Plaintiffs contend that the limitations period did not begin to run in this case until the date of the closing, November 23, 1976; as they put it, that was "the first time at the very least that the Plaintiffs would have had occasion to be made aware of the existence of [the tax lien] were it not for the omission and/or negligence of those responsible for furnishing accurate title information." Memorandum, August 17, 1982, at 23.[3] But plaintiffs' claim that Henderson, Franklin was negligent in failing to discover the IRS tax lien prior to closing has been thoroughly litigated, *see Amey, Inc. v. Henderson, Franklin, supra,* and is not now to be transformed into an antitrust claim. If plaintiffs suffered any injury cognizable under the antitrust laws, it was having to pay a fee for legal services that was inflated by the allegedly anticompetitive acts of defendants. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701

---

2. The Clayton Act's limitations provision was amended in a way irrelevant to this cause on September 30, 1976. *See* Pub.L. No. 94–435, Title III, § 302(1), 90 Stat. 1396.

Florida applies the same period to its private antitrust action as the federal statute. Fla.Stat. 95.11(3)(f) (1981). No party has suggested any reason why the limitation analysis might differ under state and federal law. It does not. *See id.* §§ 542.20, 542.32.

3. Similarly, in their memorandum in opposition to summary judgment, plaintiffs contend that they were "victims of the antitrust conspiracy ... because if they had been permitted to use their own attorney the tax lien would have been discovered." Memorandum, August 17, 1982, at 2. *But see* text accompanying notes 15–16, *infra.*

**1126**

(1977).⁴ The issue, then, is when their claim for that alleged injury arose.

 Both the old and the new Fifth Circuits have concluded that an antitrust claim is barred if brought over four years after the plaintiff became bound on the contract later alleged to violate the Sherman Act. *Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983); *City of El Paso v. Darbyshire Steel Co., Inc.*, 575 F.2d 521 (5th Cir.1978), *cert. denied,* 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979). It is clear, and plaintiffs do not bother to dispute, that they became bound to pay for Henderson, Franklin's legal services incidental to the loan from Lee County Bank on or before October 29, 1976, the day Henderson, Franklin issued its preliminary title opinion. Complaint ¶¶ 33, 34, 43; 2 Amis Depo. 20–21. *See Minskie's Follies of Florida, Inc. v. Sennes*, 206 F.2d 1, 4 (5th Cir.1953) (applying Florida law). This case does not come within the exception in *Imperial Point Colonnades Condominium, Inc. v. Mangurian*, 549 F.2d 1029 (5th Cir.), *cert. denied,* 434 U.S. 859, 98 S.Ct. 185, 54 L.Ed.2d 132 (1977) and *City of El Paso,* for plaintiffs' damages arose solely from their obligation to pay for Henderson, Franklin's services and were capable of simple calculation on the date those services were rendered. Accordingly, plaintiffs' federal and state antitrust claims are time-barred, having been brought over four years after October 29, 1976.

## II. *The Merits.*

### A. *Appropriateness of Summary Judgment on the Merits.*

In 1962, the Supreme Court expressed the view that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Poller v. Colum-*

*bia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962) (footnote omitted). Six years later, the Court reintroduced Rule 56 into antitrust litigation: "To the extent that petitioner's burden-of-proof argument can be interpreted to suggest that Rule 56(e) should, in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations, we decline to accept it." *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). Issues of motive and intent—so prevalent in *Poller*—were not central in *Cities Service* and are not in this case, for both that case and this turn on more objectively determinable issues, such as whether a conspiracy existed in the first instance. *Cities Service*, 391 U.S. at 289, 88 S.Ct. at 1593. *See Solomon v. Houston Corrugated Box Co.*, 526 F.2d 389, 395 (5th Cir.1976).

██ Plaintiffs insist that summary judgment is inappropriate at this stage of the litigation because they have been afforded an inadequate opportunity for discovery. This case was filed November 20, 1980, and substantial discovery ensued. In the next year and a half, plaintiffs deposed many witnesses, including at least one senior officer or member of each defendant. Finally, on May 19, 1982, defendant Exchange Bank of Lee County moved to stay further discovery pending resolution of its and the other defendants' motions for summary judgment. The Court heard oral argument on Exchange's motion on June 24, 1982. At that time, defendants conceded for the purpose of their pending motions for summary judgment that the markets to which plaintiffs' complaint refers exhibited parallel prices and pricing behavior. In light of that concession, plaintiffs completely failed to specify what relevant evidence was likely to be revealed upon further discovery.⁵

---

4. *Cf.* note 1, *supra.*

5. When asked specifically why he needed response to several pending interrogatories,

The Court therefore granted defendant's motion to stay further discovery; plaintiffs were allowed to proceed with several depositions as to which notices were then pending. Order, June 25, 1982. The Court was and remains convinced that plaintiffs have been afforded more than enough time to obtain discovery on the issues central to this case. *See Aviation Specialties, Inc. v. United Technologies Corp.,* 568 F.2d 1186, 1190 (5th Cir.1978).

B. *Insufficiency of the "Pairing" Claims.*

■ Plaintiffs claim that the alleged "tying" or "exclusive dealing" arrangement between Lee County Bank and the Henderson, Franklin firm violated federal antitrust statutes.[6] Even if plaintiffs had standing to assert the exclusive dealing claim,[7] the arguments are substantively without merit. The Fifth Circuit long ago upheld over an antitrust challenge the practice of savings and loan associations "in requiring [their] borrowers to pay the legal fees of attorneys selected by the savings and loan association to examine titles for it, render title opinions to it, and prepare the necessary security agreements" when lending their money. *Forrest v. Capital Buildings & Loan Association,* 504 F.2d 891 (5th Cir.1974), *cert. denied,* 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975). That holding and those that followed have been based on the elementary notion that persons and institutions have

the right to employ counsel of their own choice, and the principle remains, even when a bank succeeds as part of its mortgage loan transactions in passing its attorney's fee directly on to the borrower. *E.g. Sibley v. Federal Land Bank of New Orleans,* 597 F.2d 459, 461, 464 (5th Cir.), *cert. denied,* 444 U.S. 941, 100 S.Ct. 296, 62 L.Ed.2d 308 (1979). *See Foster v. Maryland State Savings & Loan Association,* 590 F.2d 928 (D.C.Cir.1978), *cert. denied,* 439 U.S. 1071, 99 S.Ct. 842, 59 L.Ed.2d 37 (1979). For that and other reasons,[8] plaintiffs' claims of illegal tying and exclusive dealing are clearly without merit.

C. *No Evidence of an Agreement.*

■ Plaintiffs go beyond the situations in *Forrest, Foster,* and *Sibley,* however, by adding to their "pairing" claims allegation of a horizontal agreement among some or all of the defendants. Counts one and two, titled "Price Fixing" and "Exchange of Price Information," involve claims sounding under section one of the Sherman Act, 15 U.S.C. § 1. Similarly, plaintiffs allege in count six that defendants—both banks and law firms—conspired to allocate markets for "real estate legal services" by establishing and adhering to "bilateral relationships" between each bank and a particular law firm.[9] Count seven also purports to state a claim under section one. Count eight, however, claims a violation of section two, 15 U.S.C. § 2; in it, plaintiffs allege that all

---

plaintiffs' counsel replied that they were necessary "because they are designed to develop the actual facts as they then existed." Tr. of Hearing, June 24, 1982, at 18.

**6.** The claim that these bank-law firm pairings were the subject of a horizontal market division agreement is discussed in section II(c), *infra.*

**7.** *See* note 1, *supra.*

**8.** *See, e.g. United States Steel v. Fortner Enterprises,* 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977); *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Plaintiffs have failed even to suggest any way in which Lee County Bank enjoyed any "advantage not shared by [its] competitors in the market" for mortgage loan

financing. *Fortner,* 429 U.S. at 620, 97 S.Ct. at 868. Additionally, there was no "purchase" of separate products in this case. *Foster,* 590 F.2d at 931.

**9.** This claim makes remarkably little sense with regard to the bank defendants, for the only possible economic effect of such an agreement would be to raise their costs by elevating the fee for title opinions incidental to mortgage loans. Viewed from the law firms' perspective, however, the substantive claim in count six is more plausible; their alleged agreement to work only on loans involving their respectively assigned bank "partner" would serve their economic interest by achieving a market division by bank, rather than along the more usual geographic lines. However it is viewed, count six presupposes an agreement, at least among the law firm defendants.

defendants conspired to "monopolize the practice[s] of real estate legal services and commercial mortgage financing in Lee County." *See American Tobacco Co. v. United States,* 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).[10] Each of these claims require allegation and proof of an agreement among the relevant defendants, *see United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *Scranton Construction Co. v. Litton Industries Leasing Corp.,* 494 F.2d 778, 782 (5th Cir.1974), *cert. denied,* 419 U.S. 1105, 95 S.Ct. 774, 42 L.Ed.2d 800 (1975) (quoted in *Solomon,* 526 F.2d at 394), and each must be measured with the *Forrest-Foster-Sibley* holdings well in mind.

"When faced with defendants' sworn denial of the existence of a conspiracy, it is incumbent upon the plaintiff to produce significant probative evidence demonstrating that a genuine issue of fact exists as to this element of the complaint." *Pan-Islamic Trade Corp. v. Exxon Corp.,* 632 F.2d 539, 554 (5th Cir.1980), *cert. denied,* 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981); *see Cities Services.* The appropriate standard has been recently stated:

> If reasonable inferences drawn from all the evidence—which must be viewed in the light most favorable to the plaintiff—indicate the existence of a conspiracy, the plaintiff has introduced a sufficient basis for proceeding to trial. The ultimate inference that a conspiracy existed need not be more probable than the inference that the [suspect conduct] resulted from independent business judgment. "Where more than one reasonable inference can reasonably be drawn from the proof, it is for the jury to determine the proper one." *Bordonaro Brothers Theatres v. Paramount Pictures,* 176 F.2d 594, 597 (2d Cir.1949). Where the additional evidence put forward by the plaintiff is not sufficiently probative, though, the plaintiff's desired inferences fail when measured against "the abstract standard of reasonableness." There is, in such a case, no genuine issue of material fact. *See generally, e.g., Solomon* [526 F.2d at 393–94].

*Southway Theatres, Inc. v. Georgia Theatres Co.,* 672 F.2d 485, 495 (5th Cir. Unit B 1982).

The record in this case is replete with defendants' sworn denials of any of the agreements alleged in the complaint.[11] Yet plaintiffs have produced no evidence that might reasonably support an inference that a conspiracy existed among any of these defendants.[12] Without so much as a single citation to the record, plaintiffs list in their memorandum twelve "evidentiary acts" upon which they rest their opposition to summary judgment. Only a few of these twelve involve the existence of a horizontal agreement.[13]

Plaintiffs "support" their claims of price fixing and "exchange of price information" by mentioning as "evidentiary acts" (1) the "periodic circulation of price lists including

---

**10.** Count nine comprises plaintiffs' claim that each individual law firm defendant has, by the acts alleged in counts one through eight, attempted to monopolize "the practice of real estate legal services in Lee County." How plaintiffs propose to show a dangerous probability of success is unclear in light of the allegations in count six, but the claim does not require allegation of an agreement and is therefore not discussed in this section.

**11.** *E.g.* Caldwell Depo. at 117–21; Doerr Depo. at 142–48; Edwards Affid.; Edwards Depo. at 35–38; Goldberg Affid. ¶¶ 5, 6, 9, 10; Goldberg Depo. at 50, 53–55; Schroeder Affid.; Warfield Depo. at 100–101, 170–74; Weiss Affid. ¶ 4.

**12.** Indeed, plaintiff Amis repeatedly admitted during his deposition that his allegations were based on "thirdhand information, word of mouth," and "hearsay." E.g. Amis Depo. at 22, 29, 37, 68, 103, 105, 146, 175. He also relied on conversations with the attorney who represented him in the unsuccessful malpractice action against Henderson, Franklin, Mr. T. Rankin Terry. *E.g. id.* at 77, 96, 98, 101, 146, 173, 175–76, 178; *see Amey, Inc. v. Henderson, Franklin,* 367 So.2d at 634. Mr. Terry, in turn, testified to virtually no personal knowledge of any of the alleged agreements, e.g. Terry Depo. at 79, 133–34, and conceded that what knowledge he had derived from "rank speculation." *Id.* at 190.

**13.** Others relate to plaintiffs' claims of tying and exclusive dealing or their claim of attempted monopolization.

attorney's fee quotes among the several defendants," (2) the law firms' "use of the same or uniform methods for arriving at charges for the various services," (3) the bank's refusal to permit attorneys other than their own to represent borrowers, and (4) the creation by several Lee County attorneys of the defendant Gulf Abstract. Memorandum, August 17, 1982, at 10–11. Each will be discussed in turn.

The record reveals only two fee schedules to which plaintiffs might possibly refer: those promulgated by Gulf Abstract and other title insurance companies listing premiums for title insurance and fees for other services incidental to mortgage loan transactions; and certain formulae and fee lists provided by some of the firms to their respective bank clients to enable the bank to estimate its attorney's fee at the outset of a transaction. The claims in this case and the injury of which plaintiffs complain involve attorney's fees charged in connection with mortgage loans. Schedules of premiums charged by one or several title insurance companies doing business in the area are simply unrelated to the question whether the fees charged by area attorneys for rendering title opinions were fixed according to a horizontal agreement, for nothing in the record suggests that title attorneys in the area conspired to fix their legal fees on the basis of these schedules of title insurance premiums. Similarly, the practice of certain Lee County law firms in letting their bank clients know what fee would likely be charged for rendering a title opinion in a particular transaction suggests nothing more than the unsurprising fact that purchasers who are to pay the bank's attorney's fee may be interested in an estimate of that fee. *See, e.g.,* Warfield depo. at 64–68; Schwartz Affid. (April 28, 1982).

Defendants have conceded for the purpose of their motions for summary judgment that the fees charged by Lee County attorneys for rendering title opinions were roughly similar.[14] Indeed, it is reasonable to assume that most lawyers in the Lee County area and elsewhere determine their fees by reference to the value of the property being sold. But mere parallel behavior, in the face of ubiquitous economic realities such as risk exposure, cannot possibly support an inference that the firms colluded to fix their fees. *Theatre Enterprises, Inc. v. Paramount Film Distributing Co.,* 346 U.S. 537, 541, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954); *Southway,* 672 F.2d at 494; *Quality Auto Body, Inc. v. Allstate Insurance Co.,* 660 F.2d 1195, 1200–01 (7th Cir.1981); *Weit v. Continental Illinois National Bank and Trust Co.,* 641 F.2d 457, 462–63 (7th Cir. 1981), *cert. denied,* 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982); *Schoenkopf v. Brown & Williamson Tobacco Corp.,* 637 F.2d 205, 207–09 (3d Cir.1980); *Pan-Islamic,* 632 F.2d at 558–64.

Review of the record offers scarce suggestion that any of the bank defendants "refused" to permit their borrowers to use their own attorneys. Initially, it is unclear what importance such a refusal might have in an antitrust action brought by an erstwhile borrower.[15] Nevertheless, the only reasonable indication in the record that borrowers were somehow prevented from using their own lawyers is in the "chilling" effect of the bank's "requirement" that borrowers pay the fees of the bank's attorney; such a requirement might well discourage borrowers from retaining their own attorney in uncomplicated transactions.[16] But banks have every right to retain counsel of their choice and to negotiate transactions in a way that passes that cost on to the borrower. *See* section II(b), *supra.* That said, its only suggestion with any root in the record of a bank "refusing" to allow a borrower counsel of his own choice relates to the Deep Lagoon transaction, a complex

---

**14.** The record also reveals "parallel conduct" in that each bank defendant ordinarily used a particular law firm to handle its mortgage loan transactions. Such conduct is at worst untroubling. *See* section II(B), *supra.*

**15.** *See* note 1, *supra. Cf. Foster,* 590 F.2d at 933.

**16.** *Foster* recognized the possibly chilling effect of such a requirement, 590 F.2d at 931, but considered it *de minimus. Id.* at 933.

deal in which Exchange lent over one million dollars. Exchange apparently refused to rely on title work done by T. Rankin Terry, choosing instead to rely on an "unusually qualified" member of the Allen, Knudsen firm. As noted above, Exchange had every right to choose its own counsel for its own protection in that and other transactions, especially in view of the borrower's continued right to "use whoever (sic) he chose for his own protection." Caldwell Depo. at 125. Plaintiffs' claim that this practice flowed from a horizontal agreement is without basis in the record.

Finally, the fact that a group of attorneys in Lee County incorporated Gulf Abstract in 1956 gives pause, but on reflection bears no weight in this analysis. Mr. Will J. Hayek, Jr., the first manager of Gulf Abstract, testified that lawyers in the area were having difficulty getting abstracts of title from existing companies quickly enough to enable them to render title opinions and close within a reasonable period of time. Title insurance was available far more quickly than the abstract necessary to inform a title opinion, and the attorneys' real estate work was predictably slow as a result. They met this competition by forming Gulf Abstract, a closed corporation that would and did provide evidence of title in the form of an abstract upon which the attorney might then base his opinion. Gulf Abstract's services were available to anyone "willing to pay." See Hayek Depo. at 26–27. In 1973, Gulf Abstract began acting as agent, issuing title insurance on several major underwriters, but it has never issued title opinions or generated a fee schedule for such a service. Today, Gulf Abstract continues to produce abstracts, issue title insurance policies, and provide other services incidental to mortgage loan transactions in competition with several other companies in the Fort Myers area. Attorneys in the area use Gulf Abstract's services; they also use those of its several competitors. Plaintiffs do not articulate, and this Court is at a loss to imagine, how the formation or continued operation of Gulf Ab-

stract implicates it and the other defendants in a conspiracy either to fix the fees charged by attorneys for rendering title opinions or to monopolize "the practice of real estate legal services." Complaint ¶ 92.

Accordingly, upon review of the entire record, this Court concludes that it is wholly insufficient to support an inference that these defendants conspired either to fix or stabilize attorney's fees in the ways plaintiffs suggest or to monopolize the markets to which these plaintiffs allude.

### D. "The Practice of Law."

■ Plaintiffs also claim that some or all of the defendants conspired in restraint of trade "without the express approval of the State of Florida, to cause the services of real estate title searching and describing and opinions to be included within the definition of 'the practice of law,' as recognized by the State of Florida." Complaint, count 7, ¶ 88.[17] Like most states, Florida has delimited the powers of title companies and other non-lawyers involved in real estate transactions. E.g., The Florida Bar v. Howard, 306 So.2d 515 (Fla.1975); The Florida Bar v. Columbia Title, 197 So.2d 3 (Fla.1967); The Florida Bar v. McPhee, 195 So.2d 552 (Fla.1967). The Florida Supreme Court's decisions in that regard are pursuant to Article V, Section 15 of the Florida Constitution, and undoubtedly enjoy immunity within the rule of Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 S.Ct. 315 (1943). Even if defendants' alleged activities might be said to come within the exception to Parker announced in Goldfarb v. Virginia State Bar, 421 U.S. 773, 788–92, 95 S.Ct. 2004, 2014–16, 44 L.Ed.2d 572 (1975), plaintiffs' claim in count seven must fail, for the record does not even suggest that any of these defendants participated in any way in the adoption of the challenged rules. Even if the record did contain such evidence, defendants' actions might well be immune from antitrust attack under California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). The final flaw in plaintiffs' asser-

17. This claim is cryptically entitled "Group Boycott."

tion of the claim in count seven is their complete lack of standing to challenge the Florida Supreme Court's decisions or the alleged activities of these defendants on antitrust grounds. *See Jeffrey v. Southwestern Bell*, 518 F.2d 1129, 1130–32 (5th Cir.1975).

Defendants are entitled to summary judgment on this claim.

### E. *The State Claims.*

Plaintiffs contend in count ten that the allegations of federal antitrust allegations in counts one through nine amount as well to a claim under the Florida Antitrust Act, Fla.Stat. ch. 542 (1981). The Court's disposition of plaintiffs' federal claims on the merits requires summary judgment on the merits of count ten. *Id.* §§ 542.20, 542.32.

In counts eleven and twelve, plaintiffs purport to state causes of action under "Florida Statuatory (sic) Law" and under "common law principles." So far as their thrust can be discerned from the complaint, these claims have been once litigated. *See Amey, Inc. v. Henderson, Franklin.*

Summary judgment is therefore appropriate on all of plaintiffs' state claims.

## III. CONCLUSION.

For the reasons stated, the Court is of the opinion that each defendant's motion for summary judgment should be, and it is hereby GRANTED. The Clerk is directed to enter judgment accordingly. This case is DISMISSED.