**AMEY, INC., and John C. Amis, Jr., Plaintiffs-Appellants,**

v.

**GULF ABSTRACT & TITLE, INC., et al., Defendants-Appellees.**

**AMEY, INC., and John C. Amis, Jr., Plaintiffs-Appellees,**

v.

**GULF ABSTRACT & TITLE, INC., et al., Defendants-Appellants.**

Nos. 83–3393, 83–3520.

United States Court of Appeals, Eleventh Circuit.

April 29, 1985.

Britt Whitaker, Tampa, Fla., James Ponsoldt, Athens, Ga., for plaintiffs.

Christopher L. Griffin, Tampa, Fla., Lewis R. Mills, Audrey G. Fleissig, St. Louis, Mo., for Alderman & Taminosian and 1st Nat. Bank of Fort Myers.

Charles W. Pittman, Tampa, Fla., for Lee County Bank.

Marilyn Holifield, Tampa, Fla., Robert R. Feagin, III, Tallahassee, Fla., for Exchange Bank, NCNB Nat. Bank of Fla.

Richard E. Wolverton, St. Petersburg, Fla., Gregory W. Hootman, Sarasota, Fla., for Goldberg, Rubenstein & Buckley, P.A., and Allen, Knudsen, etc.

Donald A. Gifford, Sharyn Zuch, Tampa, Fla., for Gulf Abstract.

G. Hunter Gibbons, Gregory W. Hootman, Sarasota, Fla., for Henderson, Franklin, Starnes & Holt.

William H. Adams, III, Robert J. Winicki, Jacksonville, Fla., for Barnett Bank.

Before JOHNSON and HATCHETT, Circuit Judges, and LYNNE *, District Judge.

* Honorable Seybourn H. Lynne, U.S. District Judge for the Northern District of Alabama, sitting by designation.

HATCHETT, Circuit Judge:

In this antitrust appeal we review the district court's ruling on issues of standing to sue, commencement of the statute of limitations, tying arrangements, exclusive dealing, price-fixing, discovery, and attorney's fees. We affirm.

## FACTS

Amey, Inc. is a closely-held corporation involved in the business of construction, commercial investment, and real estate development in the state of Florida. In late 1976, John Amis, its president, approached Lee County Bank for financing to purchase property owned by Sharon Hogue and the estate of Adrian Hogue. Appellants, John Amis and Amey, Inc. (Amey), contend that Lee County Bank's provision of financing was conditioned upon Amey's agreement "to purchase a real estate title search and opinion" from appellees, Henderson, Franklin, Starnes & Holt, P.A., a law firm, (Henderson), or to pay Lee County Bank $325 for the same title search and opinion to be provided by Henderson. Amey agreed to this condition, and the bank requested a title opinion from the Henderson law firm.

Prior to October 10, 1976, an abstract of title for the Hogue property was furnished to appellee, Gulf Abstract and Title, Inc. (Gulf Abstract), to be updated and certified as complete and correct. This abstract was updated through October 10, 1976, and certified by Gulf Abstract as being a true copy of all the public records affecting title to the Hogue property. On October 29, 1976, Henderson rendered its "Preliminary Opinion of Title" covering the period up to and including October 10, 1976.

On the afternoon of November 3, 1976, the Internal Revenue Service (IRS) recorded a lien in the amount of $32,107.52 against the property owned by Sharon Hogue and the estate of Adrian Hogue in the Public Records of Lee County, Florida, for taxes due. Neither Amey, Lee County Bank, nor Henderson was aware of the IRS

recording, and no one requested that the law firm make a title search covering the period subsequent to October 10, 1976. Lee County Bank made the loan and Amey purchased the property on November 23, 1976. At the closing, Lee County Bank charged Amey the $325 fee it had paid to Henderson.

After discovery of the IRS lien in 1977, Amey brought a negligence action against Henderson and its insurer, Gulf Insurance Company in Florida state court. The complaint alleged that Henderson owed Amey a reasonable duty of care in the preparation of the title opinion, including a duty to disclose whether the preliminary opinion of title fell below the usual standard for title examinations. The Circuit Court of Lee County granted summary judgment for Henderson and Gulf Insurance finding that "no attorney-client relationship existed between the defendant law firm, Henderson, Franklin, Starnes & Holt, P.A., and the plaintiff and that Henderson ... owed no legal duty to the plaintiff, Amey, Inc." *Amey, Inc. v. Henderson, Franklin, Starnes & Holt, P.A.,* No. 77–2958 (20th Cir. Fla. March 7, 1978) (Summary Judgment Order). The Florida Second District Court of Appeals affirmed, *Amey, Inc. v. Henderson, Franklin, Starnes & Holt, P.A.,* 367 So.2d 633 (Fla.Dist.Ct.App.), *cert. denied,* 376 So.2d 68 (Fla.1979).

In late 1980, Amey filed the present action in federal district court under the Clayton and Sherman Acts.[1] The complaint named Gulf Abstract, Henderson, Lee County Bank, and other banks and law firms involved in the practice of real estate law and the provision of commercial mortgage financing in the Lee County area.

Count I alleges that the banks and law firms forced Amey to pay inflated prices for legal services and mortgage financing because of a price fixing conspiracy. Count II alleges that the exchange of fixed price information between banks and law firms caused an unreasonable restraint of real estate legal practice and commercial and residential mortgage financing in Lee County. Count III alleges that Lee County Bank and Henderson had a tying arrangement by which all those purchasing mortgage financing from Lee County Bank were "required to purchase and pay for title services and title opinions provided by Henderson at inflated prices." This arrangement purportedly prevented other lawyers in the Lee County area from receiving Lee County Bank's 30 percent share of the market for commercial legal title work and its 20 percent share of all legal title work and mortgage financing in the county. Count IV repeats the allegations of Count III under the heading of "exclusive dealing." Count V alleges that Lee County Bank required each of its real estate mortgage financing customers to

---

1. Section 4 of the Clayton Act, 15 U.S.C.A. § 15 (Supp.1980) provides in relevant part: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue...."
   Section 16 of the Clayton Act, 15 U.S.C.A. § 26 (Supp.1984) provides in relevant part: "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws...."
   Section 1 of the Sherman Act, 15 U.S.C.A. § 1 (Supp.1984) provides:
   Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on convic-

tion thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.
   Section 2 of the Sherman Act, 15 U.S.C.A. § 2 (Supp.1984) provides:
   Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

agree to purchase the real estate title opinion services of Henderson at purchase or upon resale at a prearranged fixed price. Count VI alleges market and customer allocation arrangements between the respective combinations of banks and law firms by which the law firms agreed not to advertise or otherwise compete for the work of any bank other than their "partner." Similarly, the banks also agreed not to deal with any law firm other than their "partner." The injury Amey alleged is the inflation of the price for title opinion work. Count VII alleges that the law firms have engaged in a group boycott and have refused to deal with non-lawyers who are capable of performing title opinion work, by causing the providing of real estate title searching and opinion services to be included within the definition of "the practice of law." Count VIII alleges a monopoly based on the previous counts, and Count IX alleges an attempt to monopolize the practice of real estate legal services and commercial mortgage financing in Lee County. Count X makes a general claim under the Florida antitrust statutes (Fla.Stat.Ann. § 542.01–542.13, repealed in part by Laws 1980, C. 80–28 § 3 (1980) and amended by Laws 1980, C. 80–28 § 2 (1980)).[2] Count XI alleges a breach of a fiduciary duty owed by Lee County Bank to Amey through its failure to disclose that the $325 paid to Lee County Bank for Henderson's services was an "add on cost to the cost of obtaining said loan, and that [Amey] received absolutely no protection or benefit therefrom." Finally, Count XII alleges state claims to be addressed through the district court's pendent jurisdiction.

## ISSUES

The issues presented are: (1) whether Amey has standing to sue for damages; (2) whether the antitrust statute of limitations bars Amey's claims; (3) whether Amey provided sufficient evidence of the existence of a tying arrangement, of exclusive dealing, of price-fixing and customer allocation agreements, and of exchange of price information to survive summary judgment; (4) whether the district court abused its discretion in staying discovery; and (5) whether the district court erred as a matter of law in denying appellees' attorney's fees.

## STANDING

I. Suit Under Section 4 of the Clayton Act.

Section 4 of the Clayton Antitrust Act allows treble damage recovery to: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws...." 15 U.S.C.A. § 15, *as amended* Pub.L. No. 96–349, § 4(a)(1), 94 Stat. 1156 (1980) (current version at 15 U.S.C.A. § 15 (Supp.1984)). Amey asserts standing to sue for treble damages under this statute. The district court determined that Amey has only "questionable standing."[3] *Amis v. Gulf Abstract & Title, Inc.*, 564 F.Supp. 1121, 1124 n. 1 (M.D.Fla.1983).

■ To sue for treble damages under section 4 of the Clayton Act, the complaint must facially satisfy that section's requirements. First, the complainant must be a "person." The United States is not a person under this section, but can sue under section 4A of the Clayton Act, 15 U.S.C.A. § 15a (Supp.1984). Second, actual injury must be alleged. The Supreme Court has provided the lower courts with some assistance in the identification of a "person injured." In *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, the Court restricted the "passing on" defense by which a defendant could argue that a plaintiff/purchaser was not a "person injured" where the defendant passed on to those customers the higher, inflated price caused by the antitrust violation. *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S.

---

**2.** Fla.Stat.Ann. § 542.33 provides in part:

(1) Every contract by which anyone is restrained from exercising a lawful profession, trade or business of any kind, otherwise than

is provided by subsections (2) and (3) hereof, is to that extent void.

**3.** Amey argues that it at least has standing to sue for injunctive relief.

481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). *See* Note, *Private Antitrust Standing,* 61 Wash.U.L.Q. 1069 n. 4 (1984); Gardner, *Private Enforcement,* 25th Annual Antitrust Law Institute 711, 715 (1984). In *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), the Supreme Court addressed the question of whether the passing on of inflated prices caused by an antitrust violation could be used offensively. Under such a theory, a customer who paid the higher price could qualify as a "person injured" under the Clayton Act. The Court held that indirect purchasers could not sue under the Clayton Act for treble damages: "The overcharged direct purchaser, and not others in the chain of manufacture or distribution is the party 'injured.'" *Illinois Brick,* 431 U.S. at 729, 97 S.Ct. at 2066. In *Reiter v. Sonotone Corp.,* 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), the Supreme Court substantially limited the direct purchaser requirement by holding that consumers could sue under limited circumstances. It held that the higher, inflated price paid was "property" as contemplated by the Clayton Act.

The third requirement for suit under section 4 of the Clayton Act is that the "business or property" injury must be of a commercial nature. *Hawaii v. Standard Oil Company of California,* 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). Fourth, a complainant must allege that the injury suffered was an "antitrust injury": "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

■ For a court to find that a plaintiff has standing to bring an antitrust claim, more than constitutional standing must exist; the court must find a close relationship between the plaintiff's injury and the alleged antitrust violation. *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 535, 103 S.Ct. 897, 907, 74 L.Ed.2d 723 (1983).

Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action. *See* Berger & Bernstein, *An Analytical Framework for Antitrust Standing,* 86 Yale LJ 809, 813, n. 11 (1977); Pollock, *Standing to Sue, Remoteness of Injury, and the Passing-On Doctrine,* 32 ABA Antitrust LJ 5, 6–7 (1966).

*Associated General,* 459 U.S. at 535 n. 31, 103 S.Ct. 907 n. 31. *See also* Note, 61 Wash.U.L.Q. at 1070 n. 5.

II. Antitrust Standing.

Although agreement on the basic requirements of an antitrust complaint exists, a variety of formulations has been developed by the federal circuits, varying the quality and quantity of the relationship among the elements, "persons injured," "injury," and "business or property." *See* Note, 61 Wash.U.L.Q. at 1070 n. 6, n. 7, 1083–1100 (reviewing the divergent tests of antitrust standing in the federal circuits). The "direct injury" test was among the first antitrust tests federal courts employed. Under this test, to have standing, a plaintiff must have been in a direct commercial relationship with the defendant at the time of the injury. *Loeb v. Eastman Kodak Co.,* 183 F. 704 (3d Cir.1910); *Ames v. American Telephone and Telegraph Co.,* 166 F. 820 (C.C.D.Mass.1909). Some courts have also required privity of contract. *See* Note, 61 Wash.U.L.Q. at 1073 n. 22. The direct injury test requires the trial judge to make the subjective determination of which injuries are direct and which are not direct. *See* Berger & Bernstein, *An Analytical Framework for Antitrust Standing,* 86 Yale L.J. 809, 819 (1977).

As a derivative of the direct injury test, some circuit courts grant standing only to persons within the market affected by the antitrust violation. *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 478 n. 14, 102 S.Ct. 2540, 2548 n. 14, 73 L.Ed.2d 149

(1982). To obtain standing under this target area test, plaintiff "must be one against whom the conspiracy is aimed. Or, ... the complainant must show that he is within that sector of the economy which is endangered by a breakdown of competitive conditions in a particular industry." *Jeffrey v. Southwestern Bell*, 518 F.2d 1129, 1131 (5th Cir.1975). While the traditional target area test requires that the antitrust violators "aim" at the plaintiff, proof of conspiratorial intent to injure is not necessary. All that is required is that the plaintiff be in the sector of the economy which is the target of the antitrust violation. *Blue Shield v. McCready*, 457 U.S. at 479 n. 15, 102 S.Ct. at 2548 n. 15; *Construction Aggregate Transport, Inc. v. Florida Rock Industries, Inc.*, 710 F.2d 752, 765 (11th Cir.1983). A more recent formulation of the target area test requires that the plaintiff be a foreseeable victim of the anticompetitive conduct. *Twentieth Century Fox Film Corp. v. Goldwyn*, 328 F.2d 190 (9th Cir.), *cert. denied*, 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87 (1964). *See also* Note, 61 Wash.U.L.Q. at 1076, 1076 n. 38–41.

The Sixth Circuit created a third test in *Malamud v. Sinclair Oil Corp.*, 521 F.2d 1142 (6th Cir.1975), and the Supreme Court adopted it in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1978). Under the Sixth Circuit test, to have standing to sue for antitrust injuries, the plaintiff's injuries must fall within the zone of interest protected by the antitrust laws. *Malamud v. Sinclair Oil*, 521 F.2d at 1151–52. Indistinguishable in its requirements from the zone of interest test is that of the *Brunswick* test, which requires a showing that the injury is of the "type that the statute was intended to forestall." *Brunswick Corp.*, 429 U.S. at 487–88, 97 S.Ct. at 697 (quoting *Wyandotte Co. v. United States*, 389 U.S. 191, 202, 88 S.Ct. 379, 386, 19 L.Ed.2d 407 (1967)). The final test of antitrust standing is that applied by the Third Circuit. It is a policy-balancing test containing many factors in lieu of a "talismanic test capable of resolving all ... standing

problems." *Bravman v. Bassett Furniture Industries, Inc.*, 552 F.2d 90, 99 (3d Cir.1977).

The authoritative words on the testing of antitrust standing have been provided by the Supreme Court in *Blue Shield v. McCready* and *Associated General Contractors v. California State Council of Carpenters*. *Blue Shield* involved the refusal of a health plan to reimburse subscribers for psychotherapy services provided by psychologists, while reimbursing subscribers for psychotherapy services provided by psychiatrists. In its interpretation of the Clayton Act's treble damages provisions, the Court endorsed the target area test. The Court found that McCready had standing to sue for treble damages since no possibility of double recovery existed because the psychologist who was paid by McCready could "link no claim of injury to himself arising from his treatment of McCready.... [The psychologist] has been fully paid for his service and has not been injured by Blue Shield's refusal to reimburse her for the cost of his services." *Blue Shield*, 457 U.S. at 475, 102 S.Ct. at 2546. Additionally, the injury suffered by McCready was not too remote from the antitrust violation because McCready's injury was not only foreseeable, but was a "necessary step in effecting the ends of the alleged illegal conspiracy." *Blue Shield*, 457 U.S. at 479, 102 S.Ct. at 2549. Since McCready suffered an antitrust injury, the *Blue Shield* Court held that McCready was a "person injured," had standing to sue under the Clayton Act.

*Associated General Contractors v. California State Council of Carpenters* involved the claim of a union that a multi-employer association coerced third parties and other members of the employer association to enter into business relationships with nonunion contractors and subcontractors. In holding that the union did not have standing, the Court identified the following relevant factors: (1) a causal connection between an antitrust violation and harm to the plaintiff, (2) defendants intended to cause the harm, (3) the existence of an

antitrust injury, (4) the directness of a causal link between the injury and the market restraint, (5) the speculative nature of the damages, and (6) the risk of duplicate recoveries or complex apportionment of damages. *Associated General,* 459 U.S. at 536–45, 103 S.Ct. at 907–912.

It is too early to tell how the circuit courts of appeals will fashion tests of antitrust standing in light of *Blue Shield* and *Associated General.* To date, the First, Fourth, Seventh, and Tenth Circuits have not addressed the standing question in light of these two Supreme Court decisions. The Second Circuit follows *Blue Shield.* The Third Circuit has adhered to its policy balancing approach. The Sixth and Eighth

Circuits have adopted the *Associated General* factors for determining standing, and the Ninth Circuit has addressed the standing question, but with no clear resolution.[4]

The Fifth Circuit follows the "target area test" where the plaintiff must show that he is within the sector of the economy threatened by the breakdown of competition. *Associated Radio Service Co. v. Page Airways, Inc.,* 624 F.2d 1342, 1362 (5th Cir.1980), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1981); *Larry R. George Sales Co. v. Cool Attic Corp.,* 587 F.2d 266 (5th Cir.1979); *Donovan Construction Co. of Minnesota v. Florida Telephone Corp.,* 564 F.2d 1191

4. The First Circuit has yet to harmonize *Blue Shield* and *Associated General Contractors.* The only treatment of those two cases has been in the context of standing to sue for injunctive relief. *See, e.g., Kartell v. Blue Shield of Massachusetts,* 582 F.Supp. 734 (D.Mass.1984) (applying the *Associated General* factors by analogy to hold that doctors did not have standing to obtain an injunction against restraint of trade in the prepaid health care market and distinguishing *Blue Shield* on its facts).

One panel of the Second Circuit has aligned itself with the liberal standing approach of *Blue Shield* and distinguished *Associated General* as not limiting the application of *Blue Shield. See Crimpers Promotions, Inc. v. Home Box Office,* 724 F.2d 290 (2d Cir.1984) ("*Associated General* indicates no departure from *McCready* in any fashion pertinent to this case").

One panel in the Third Circuit has reaffirmed that Circuit's adherence to balancing the policies of the Clayton Act to decide the standing question instead of relying on the specific prescriptions of either *Blue Shield* or *Associated General. See Merican, Inc. v. Caterpillar Tractor Co.,* 713 F.2d 958 (1984) (weighing the policies against double recovery and overly-complex damage claims in holding that an unauthorized dealer who purchased from an authorized dealer does not have standing to sue the manufacturer for treble damages).

The Fourth Circuit has yet to harmonize *Blue Shield* and *Associated General,* and, therefore, continues to employ the foreseeable target area approach of its decisions in *Blue Shield v. McCready,* 649 F.2d 228 (4th Cir.1981), *Ratliff v. Burney,* 657 F.2d 640 (4th Cir.1981), and *South Carolina Council of Milk Producers v. Newton,* 360 F.2d 414 (4th Cir.1966).

The Sixth Circuit has abandoned its reliance on the zone of interests test and adopted the *Associated General* factors test to determine standing. *See Southaven Land Co. v. Malone & Hyde, Inc.,* 715 F.2d 1079 (6th Cir.1983) (lessor

of commercial premises did not have standing to sue a lessee for anti-competitive conduct where diminished consumer interest and activity at lessor's shopping area was unrelated to the anti-competitive activity) and *Goldberg, Inc. v. Goldberg,* 717 F.2d 290 (6th Cir.1983) (shareholder does not have standing to bring an antitrust suit against a third party for injuries to his interest in the corporation).

The Seventh Circuit has yet to resolve the Supreme Court cases. As a result, the target area approach remains as the generally accepted measure of standing in that circuit. *See* Note, 61 Wash.U.L.Q. at 1093–94.

The approach of *Associated General* has been squarely adopted by the Eighth Circuit. *See McDonald v. Johnson & Johnson,* 722 F.2d 1370, 1371 (8th Cir.1983) (enumerating the *Associated General* factors).

The treatment given *Associated General* by the Ninth Circuit has been inconsistent.

[I]n *Chelson v. Oregonian Publishing Co.,* [715 F.2d 1368 (9th Cir.1983)] the court of appeals purported to apply the *Associated General* analysis, but couched its discussion solely in terms of antitrust injury. The court allowed news dealers to sue their publisher for requiring exclusive dealing agreement as a condition of news distribution. In Park v. Watson, however, the court of appeals read *Associated General* as supplementing the foreseeable target area test. These divergent readings of *Associated General* provide no consistent guidelines for antitrust standing in the Ninth Circuit.

Note, 61 Wash.U.L.Q. at 1098. *See also Solinger v. A. & M. Records, Inc.,* 718 F.2d 298 (9th Cir.1983) (prospective shareholder of an injured corporation does not have standing).

The Tenth Circuit has yet to address standing in light of the competing policies and factors of *Blue Shield* and *Associated General. See generally* Note, 61 Wash.U.L.Q. at 1098–99.

(5th Cir.1977), *cert. denied*, 435 U.S. 1007, 98 S.Ct. 1878, 56 L.Ed.2d 389 (1978); *Yoder Brothers, Inc. v. California-Florida Plant Corp.*, 537 F.2d 1347 (5th Cir.1976), *cert. denied*, 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977). *See also Blue Shield*, 457 U.S. at 478 n. 14, 102 S.Ct. at 2548 n. 14. Under this traditional formulation of the target area test, "even though an individual may suffer a pocketbook injury, he must be the 'target' of the anti-competitive practice before he may sue." *Pan Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 546 (5th Cir.1980) (citing *Jeffrey v. Southwestern Bell*, 518 F.2d 1129, 1131 (5th Cir. 1975)). The traditional target area test of standing, as employed by the Fifth Circuit, requires the use of a two-step procedure. First, the court identifies the area of the economy threatened by the alleged antitrust conduct. Second, the court determines whether the plaintiff's injury is within that target area, or if the defendant "aimed" at the plaintiff. *Yoder Brothers, Inc. v. California-Florida Plant Corp.*, 537 F.2d at 1359. *See also* Note, 61 Wash. U.L.Q. at 1090 n. 162 (listing cases employing the two-step procedure of the target area test).

*Blue Shield* and *Associated General* have had little effect on the Fifth Circuit's use and application of the target area test. In *Walker v. U-Haul Company of Mississippi*, the Fifth Circuit held that a franchisee, who was essentially an agent of the franchisor, did not have standing to sue the franchisor for violations of antitrust laws. The court gave little deference to the Supreme Court cases:

> *Associated General Contractors* rejected the 'target area' test, as well as the numerous other tests devised by various circuits to determine antitrust standing, recommending instead that 'courts should analyze each situation in light of the factors set forth' in the opinion. At [459 U.S.] 536 n. 33, 103 S.Ct. at 908 n. 33, 74 L.Ed.2d at 737. But neither that

case nor *McCready* dispensed with the requirement that a section 4 plaintiff must establish an injury to competition and not merely an injury to himself. *Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300, 303 (5th Cir.1984). Under the facts of this case, we find that *Action Towing* [employing the target area test including the specific requirement of a showing of antitrust injury] still controls.

> *Walker v. U-Haul Co. of Mississippi*, 734 F.2d 1068, 1073 (5th Cir.1984) (footnotes omitted). *See Action Towing and Rental v. U-Haul International*, 507 F.Supp. 987 (E.D.La.1981), *aff'd* 683 F.2d 415 (5th Cir. 1982). In another case on remand from the Supreme Court for consideration in light of the *Associated General* factors, the Court stated that "we have no difficulty in reaffirming our former judgment upon the record before us." *Industrial Investment Development Corp. v. Mitsui and Company*, 704 F.2d 785, 786 (5th Cir.1980).

■ The Eleventh Circuit has adopted the "target area" test used by the Fifth Circuit.[5] See *Construction Aggregate Transport, Inc. v. Florida Rock Industries, Inc.*, 710 F.2d 752, 762 (11th Cir. 1983). The rule of antitrust standing in this circuit, the target area test, does not produce results materially different from the results obtained in *Blue Shield* and *Associated General*. See *Construction Aggregate Transport*, 710 F.2d at 762, 765, 765 n. 28. First, as in *Blue Shield*, we recognize that a "target" does not have to be in the same area of the market as the antitrust act; a victim is a target when located in the same area of the market affected by the antitrust act or in another area of the market "so closely related" that both may be considered targets of the same anti-competitive act. *Construction Aggregate Transport*, 710 F.2d at 764; *Blue Shield*, 457 U.S. at 479–81, 102 S.Ct. at 2548–49. Second, our test is highly re-

---

5. In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), this circuit adopted the case law of the former Fifth Circuit handed down as of September 30, 1981. *Bonner*, 661 F.2d at 1209. *Cf. Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir.1982) (adopting as binding precedent all post-September 30, 1981, decisions of Unit B of former Fifth Circuit).

sponsive to the Supreme Court's policies of denying standing to plaintiffs with injuries that are too remote and whose injuries are not "the type of loss which a violation of antitrust law would be likely to cause." *Midwestern Waffles, Inc. v. Waffle House, Inc.,* 734 F.2d 705, 710 (11th Cir.1984); *Construction Aggregate Transport,* 710 F.2d at 764, 765. *See Associated General,* 459 U.S. at 540, 103 S.Ct. at 910; *Blue Shield,* 457 U.S. at 479, 102 S.Ct. at 2548. *See also Jeffrey v. Southwestern Bell,* 518 F.2d 1129, 1131 (5th Cir.1975). Third, the Supreme Court's policy against granting standing where the possibility exists of duplicative recovery by the indirectly injured plaintiff and the more directly injured person who has yet to sue, *see Associated General,* 459 U.S. at 545, 103 S.Ct. at 912, *Blue Shield,* 457 U.S. at 475, 102 S.Ct. at 2546, has long been part of this circuit's and the former Fifth Circuit's target area test. *Construction Aggregate Transport,* 710 F.2d at 764; *Jeffrey v. Southwestern Bell,* 518 F.2d at 1131. The Supreme Court cases, therefore, provide policy guidance consistent with that which is the foundation of this circuit's target area test. *See Midwestern Waffles, Inc.,* 734 F.2d at 710. *See also Quality Foods de Centro America, S.A. v. Latin American Agribusiness Development Corp.,* 711 F.2d 989, 999 (11th Cir.1983).

### III. Does Amey Have Antitrust Standing?

An analysis of standing requires an examination of the complaint's allegations. *Construction Aggregate Transport,* 710 F.2d at 763; *Pan-Islamic Trade Corp. v. Exxon Corp.,* 632 F.2d 539, 547 (5th Cir. 1980); *In re Beef Industry Antitrust Litigation,* 600 F.2d 1148, 1168 (5th Cir.1979); *Yoder Brothers, Inc.,* 537 F.2d at 1359. According to Amey's complaint, Gulf Abstract and Title, Inc., is "in the business of providing real estate title services"; the law firms are in the business of practicing real estate law; and the banks are "in the business of selling financing, money and related services, including real estate title opinions, necessary for commercial real es-

tate transactions in or about Lee County, Florida." Amey, is a corporation engaged in the business of construction, commercial investment, and real estate development. John C. Amis, Jr. is an officer and controlling shareholder of Amey and will "need in the future to purchase [the bank and law firm's] services and financing."

The complaint further alleges that the bank and law firm's anti-competitive activities included: (1) requiring "mortgage consumers to pay for legal opinions and services incident to real estate transactions fees in accord with the published fee schedule," (2) abiding by the terms of the fee schedule with the effect that "real estate legal fees in Lee County have been fixed, stabilized, and are uniform in proportion to the size of the real estate transaction in each case," (3) entering into "exclusive dealing and tying relationships" regarding the "provision of real estate legal services," (4) agreeing that "each of the bank defendants should require mortgage financing customers" as a condition for obtaining the mortgage financing (the tying product) over which the banks jointly and individually have substantial market power to purchase and pay for real estate title opinions (the tied product), (5) agreeing "that each of the bank[s] should resell and require its mortgage customers to pay (a fixed price) for the real estate title opinion submitted to the bank defendants for the mutual benefit of the banks", (6) causing to be "issued and enforced opinions of the Florida Bar Association defining the practice of law as including real estate title work, knowing that the effect of such opinions would be to preclude equally qualified nonlawyers from performing real estate title searches and related work," (7) causing the purchased property to be subject to a $32,107.52 lien, (8) inflating the "cost of real estate in Lee County," damaging "all purchasers of commercial real estate and mortgage financing in Lee County," (9) denying Amey the opportunity to "engage another person or attorney to search the title to the ... real estate just prior to the closing of the purchase of that real estate."

To determine whether Amey has antitrust standing to sue for treble damages, we must (1) identify the market area adversely affected by the alleged antitrust activity and (2) then decide whether the alleged injury occurred within that market area. *Construction Aggregate Transport,* 710 F.2d at 762; *Yoder Brothers, Inc. v. California-Florida Plant Corp.,* 537 F.2d 1347, 1359 (5th Cir.1976).

Amey contends that the issue of its standing is controlled by *Blue Shield* which provides an expansive and literal reading of section 4 of the Clayton Act and rejects the target area test.[6] Amey argues that the antitrust standing question is resolved by asking whether the alleged anticompetitive conduct "proximately causes" injury to plaintiff's "property, attributable to price enhancement or the reduction of competition," citing *Blue Shield,* 457 U.S. at 477, 102 S.Ct. at 2547. As a result, under this test of standing, the alleged exclusive dealing, tying, and price fixing arrangements were the proximate cause of the injuries to Amey.

The banks and law firms argue that under the target area test, Amey was not a target of the alleged anti-competitive activity. They contend, first, that the true targets of the alleged unlawful conduct are other lawyers in the Lee County area practicing real estate law, or other banks and consumers who are in an attorney-client relationship for the purpose of receiving the real estate legal services. They also contend that Amey did not suffer antitrust injury; they argue: "Plaintiffs cannot possibly contend that the antitrust laws were intended to prevent lawyer negligence in connection with title searches." As a result they conclude that any injury caused by the lack of a final title search up to the date of closing was too remote from the alleged antitrust violations to be actionable.

A. Identification of Market Affected

Amey contends that the relevant market for consideration is the entire market of real estate legal services in Lee County. The banks and law firms contend that the market is limited to the interaction between the providers of legal title search services and the direct consumers of those services. Our review of the allegations of the complaint lead us to hold that Amey was "within that area of the economy ... endangered by [that] breakdown of competitive conditions." *Blue Shield,* 457 U.S. at 480, 102 S.Ct. at 2549.

The banks and law firms have economic interests in two sectors of the real estate legal services market: (1) the bank-law firm market which provides title services to banks and other direct consumers and (2) the bank-mortgagor market. The bank-law firm sector of the real estate legal services market is integrally related to the bank-mortgagor sector; *it is the mortgagor's payment of the cost of the law firm's title search services which the bank passes on to the law firm. See, e.g., Construction Aggregate Transport,* 710 F.2d at 764. The identification of the bank-law firm sector and the bank-mortgagor sector as integrally related and endangered by the alleged anti-competitive conduct is mandated by *Blue Shield.*

In *Blue Shield,* the health plan argued that the relevant market for standing purposes was the market in group health care plans, and as such, standing was "limited to participants in that market ... entities such as McCready's employer, who were purchasers of group health plans, but not to McCready as a beneficiary of the Blue Shield plan." *Blue Shield,* 457 U.S. at 479–80, 102 S.Ct. at 2549. While the Supreme Court acknowledged that McCready was not in the area of the market taken up by the group health care plans, the Court held that McCready was in a market in which she was a "consumer of psychotherapy services entitled to financial benefits under the Blue Shield plan." *Blue Shield,*

---

**6.** Amey gives little weight to precedent established by the former Fifth Circuit decisions and the specific adherence of this circuit to those decisions. *Blue Shield* does not limit the application of the target area test of antitrust standing. *See Construction Aggregate Transport,* 710 F.2d at 765–66.

457 U.S. at 480, 102 S.Ct. at 2549. The Court reasoned that because the harm to McCready was so clearly foreseeable and was, indeed, a "necessary step in effecting the ends of the alleged illegal conspiracy, McCready was within the market threatened by the anti-competitive conduct." *Blue Shield*, 457 U.S. at 479–81, 102 S.Ct. at 2548–2550. *See also Construction Aggregate Transport*, 710 F.2d at 764–65. In this case, Amey is not a participant in the bank-law firm title services market. It is beyond question, however, that the injury to Amey, payment of an allegedly fixed and inflated price for title search legal services, was both a "foreseeable" and "necessary" step in furthering the objective of the conspiracy. Accordingly, Amey was within the target area, the market endangered by the alleged antitrust violation.[7]

### B. Injury Within Market Area

The target area test requires that Amey's injuries occur within the target area. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Amey's complaint recites that the injuries suffered as a result of the alleged anti-competitive conduct, included (1) inflated fees for title search services, (2) lack of choice in selecting the provider of title search services, (3) lack of choice of obtaining mortgage financing without also obtaining the title search services provided by a particular law firm, and (4) the $32,000 lien on the purchased property due to the negligence of the title searchers. Amey argues that even if these are not "antitrust injuries," its injuries are not so remote as to designate Amey as an indirect purchaser but, rather, the injuries come under the cost-plus exception to *Illinois Brick*. The banks and law firms respond that "plaintiffs [Amey] cannot possibly contend that the antitrust laws were intended to prevent lawyer negligence in connection with title searches, which is the loss plaintiffs complain of."

Although the law firms and the banks are correct in arguing that the effects of the negligent title search do not constitute an injury which Congress intended the antitrust laws to remedy, we hold that Amey's payment of an allegedly inflated price for title search services is an injury occurring within the market endangered by the alleged anti-competitive activity. Accordingly, Amey has standing to sue for treble damages under section 4 of the Clayton Act.

The framework for understanding the issues of causation, remoteness of injury, and antitrust standing to sue for damages is provided by the common law. *Associated General Contractors*, 459 U.S. at 533, 103 S.Ct. at 906. Amey claims to have suffered a tort, negligence. *Associated General* declares:

> '[W]here the plaintiff sustains injury from the defendant's conduct to a third person, it is too remote, if the plaintiff sustains no other than a contract relation to such a third person, or is under contract obligation on his account, and the injury consists only in impairing the ability or inclination of such person to perform his part, or in increasing the plaintiff's expense or labor of fulfilling such contract, *unless the wrongful act is willful for that purpose.*'

*Associated General Contractors*, 459 U.S. at 532 n. 25, 103 S.Ct. at 906 n. 25 (quoting 1 J. Sutherland, Law of Damages, 55–56 (1882)) (emphasis added). In this case, Amey alleges injury from Henderson's negligence in providing an incomplete title search to the third party, Lee County Bank. Amey's only relationship to Lee County

---

**7.** In its alternate holding that Amey did not have standing, the district court implicitly determined that Amey was not within the market endangered by the alleged antitrust conduct. The court agreed with the banks and law firms that the only market relevant to the standing inquiry was that of the providers of title services and the direct consumers of those services. As such, the court found, those with standing to redress the alleged antitrust violations by the appellants in this case, would be other attorneys in the Lee County area who desire to engage in the provision of title service work to the conspiring banks. The court relied on *Illinois Brick*. We do not view *Illinois Brick* as controlling.

Bank, the third party, is contractual based on the executory contract to result in the closing. The incomplete title search increased Amey's expense of fulfilling the real estate contract. Because the faulty completion of the title search was not "willful," therefore, Amey cannot recover the injuries caused by such negligence.

■ Amey also alleges that the antitrust violations caused it to pay for "legal fees," the cost of the title search services, which were fixed and stabilized as part of the price fixing scheme. On appeal, Amey alleges injury in having to pay a higher than competitive market price for the title search services. We recognize that "the determination of standing is a preliminary one, to be answered only from an examination of the allegations of the complaint." *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 547 (5th Cir.1980); *In re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1168 (5th Cir.1979). Antitrust complaints are subject to the liberal pleading requirements of the federal rules, and, at a minimum, the complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). *See Quality Foods de Centro America, S.A. v. Latin American Agribusiness Development Corp.*, 711 F.2d 989, 995 (11th Cir. 1983). Accordingly, we find that Amey's complaint alleges an injury of having to pay a higher price for title search legal services than would be necessary in an unrestrained market.

We must determine whether Amey has suffered an "antitrust injury" in having to pay an allegedly higher price for title search legal services.[8] Paying a higher price for goods or services is an injury to "property" within the meaning of section 4 of the Clayton Act. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979) ("a consumer not engaged in a 'business' enterprise, but rather acquiring goods or services for personal use, is injured in 'property' when the price of those goods or services is artificially inflated by reason of the anticompetitive conduct complained of"). *See also Associated General*, 459 U.S. at 530 n. 20, 103 S.Ct. at 904 n. 20; *Blue Shield*, 457 U.S. at 473, 102 S.Ct. at 2545. Amey, therefore, suffered an injury intended by Congress to be redressed by the antitrust laws. Accordingly, we hold that Amey has standing to sue under section 4 of the Clayton Act for treble damages as it is within the market endangered by the alleged anti-competitive conduct and its injury occurred within that market.

## STATUTE OF LIMITATIONS

■ An antitrust action must be brought "within four years after the cause of action accrues." 15 U.S.C.A. § 15b (Supp.1984). The district court determined that the only injury cognizable under the antitrust laws suffered by Amey was the payment of a fee for legal services that was allegedly inflated by defendants' anti-competitive acts. Accordingly, citing Fifth Circuit cases, the court applied the rule that an antitrust claim accrues when the "plaintiff became bound on the contract later alleged to violate the Sherman Act." *Amis*, 564 F.Supp. at 1126 (citing *Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045 (5th Cir.1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983); *City of El Paso v. Darbyshire Steel Co., Inc.*, 575 F.2d 521 (5th Cir.1978), *cert. denied*, 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979)). The court concluded that Amey "became bound to pay for Henderson, Franklin's legal services incidental to the loan from Lee County Bank on or before October 29, 1976, the day Henderson, Franklin issued its preliminary title opinion." The court held further that the facts of this case do not come under the exception in *Imperial Point Co-*

---

**8.** Proof that Amey actually paid a higher price or was required to pay a higher price by Lee County Bank is not necessary for a determination of standing. Preliminary litigation over these threshold questions would in effect be a trial on the merits. *See Construction Aggregate Transport*, 710 F.2d at 763 n. 24.

*lonnades Condominium, Inc. v. Manguri-an,* 549 F.2d 1029 (5th Cir.), *cert. denied,* 434 U.S. 859, 98 S.Ct. 185, 54 L.Ed.2d 132 (1977), and *City of El Paso.* In those cases the courts held that a cause of action "accrues" where a continuing violation occurs when a party derives "continuing benefits" from acts committed subsequent to the signing of the contract and where damage to plaintiff was incapable of precise proof at the time of the signing. *Imperial Point Colonnades Condominium,* 549 F.2d at 1035. The court found that plaintiffs' "damages arose solely from their obligation to pay for Henderson, Franklin's services and were capable of simple calculation on the date those services were rendered. Accordingly, plaintiffs' federal and state antitrust claims are time barred having been brought over four years after October 29, 1976."

Amey denies that its cause of action accrued when it received the abstract. It argues: "Plaintiffs' obligation to reimburse the legal fees was only contingent upon the bank's paying those fees, when determined." "Only if and when the bank received the law firm's completed services and was itself billed did the plaintiffs [Amey] arguably become obligated to pay the *bank.*"

The guiding principles for determining when antitrust claims have accrued were laid down by the Supreme Court in *Zenith Radio Corp. v. Hazeltine Research,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). In that case, defendant, Zenith, filed an antitrust counterclaim against Hazeltine Research alleging injury from a restraint of trade caused by Zenith's exclusion from the Canadian, British, and Australian markets because of Hazeltine's participation in patent pools in that market.

> Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business.... In the context of a continuing conspiracy to violate the antitrust laws, such as the conspiracy in the instant case, this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act.... Thus, if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date.

*Zenith Radio Corp.,* 401 U.S. at 338–39, 91 S.Ct. at 806. *Zenith* contemplates that a continuing violation giving rise to a new limitations period exists when impact is felt from a conspiracy that has more than one injurious act.

The only injury alleged by Amey which is cognizable under the antitrust laws is that of the payment of the inflated fee for legal services. The district court's finding that the injury to Amey, the "impact" within the meaning of *Zenith Radio,* occurred on or before October 29, 1976, is clearly erroneous. The obligation to pay for Henderson's services could only have ripened at the time of the issuance of the preliminary title opinion if Amey had been the client of Henderson, that is, if they had privity of contract. The Florida courts have already established that Amey had no privity with Henderson. *Amey, Inc. v. Henderson, Franklin, Starnes & Holt, P.A.,* 367 So.2d 633 (Fla.Dist.Ct.App.1979). As a matter of contract law, therefore, the mere fact that Henderson issued the preliminary title opinion on October 29, 1976, did not obligate Amey to pay for that title opinion at that time. No evidence exists that Amey contracted with Lee County Bank to pay for the title opinion on the date of its issuance. While it can be argued, as the banks and law firms do, that Amey was aware of the issuance of the title opinion, awareness does not convert to a contractual obligation to pay for the services. Only when payment for the services became due through agreement of Amey and Lee County Bank did Amey become obligated to pay. It cannot be said, therefore, that Amey's

viewing of the preliminary title opinion on October 29, 1976, vested Amey's obligation to pay for the legal services provided by Henderson.

We hold, therefore, that Amey's antitrust claims accrued at the date of closing on November 23, 1976, and that Amey's filing of the instant cause of action on November 20, 1980, was not time barred by the four-year statute of limitations.

## SUMMARY JUDGMENT

The district court granted summary judgment in favor of the banks and law firms on Amey's Sherman Act section 1 claims. Those claims alleged the existence of a tying arrangement, exclusive dealing, customer allocation, price fixing, and exchange of price information agreements. The court also granted summary judgment on Amey's Sherman Act section 2 claims. Those claims alleged the existence of a monopoly and an attempt to monopolize real estate legal services and commercial mortgage financing in Lee County. The district court noted that a major element of each claim is the existence of an agreement.

Appellate review of the granting of a motion for summary judgment questions whether any genuine issue of material fact exists. Fed.R.Civ.P. 56(c). When reviewing a summary judgment decision, the reviewing court is bound by the same "legal standards as those that control the district court in determining whether summary judgment is appropriate." *Thrasher v. State Farm Fire and Casualty Co.*, 734 F.2d 637, 638 (11th Cir.1984); *Environmental Defense Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. Unit A 1981). Further, it is the movant for summary judgment who bears the burden of showing that no genuine dispute exists as to any material fact. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In determining whether the movant has met its burden, the reviewing court must examine the evidence in a light most favorable to the opponent of the motion. *Adickes*, 398 U.S. at 157, 90 S.Ct. at

1608; *Thrasher*, 734 F.2d at 638. All reasonable doubts and inferences should be resolved in favor of the opponent. If reasonable minds differ on the inferences generated by undisputed facts, then summary judgment is inappropriate. *Impossible Electronics Techniques, Inc. v. Wackenhut Protective Systems, Inc.*, 669 F.2d 1026, 1031 (5th Cir. Unit B 1982).

■ Bound by these legal standards, we are mindful that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Norfork Monument Co. v. Woodlawn Memorial Gardens*, 394 U.S. 700, 704, 89 S.Ct. 1391, 1393, 22 L.Ed.2d 658 (1969) (quoting *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962)). We recognize, however, that plaintiff carries the burden, when defendants have denied the allegations, of admitting significant probative evidence of the existence of genuine issues of fact. *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 554 (5th Cir.1980), *cert. denied*, 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981).

### I. Tying Arrangement Claim

Amey argues that the evidence it presented of the existence of a tying arrangement to benefit both Henderson and Lee County Bank, was a sufficient Sherman Act claim under, at least, a rule of reason analysis.

■ A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Not all tying arrangements violate section 1 of the Sherman Act. *Jefferson Parish Hospital v. Hyde*, —– U.S. —–, —–, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984). An illegal tying arrangement has five elements: (1) "a ty-

ing and a tied product"; (2) "evidence of actual coercion by the seller that in fact forced the buyer to [purchase] the tied product"; (3) that the seller have sufficient market power in the tying product market to force the buyer to accept the tied product; (4) "anticompetitive effects in the tied market"; and (5) "involvement of a 'not insubstantial' amount of interstate commerce in the tied product market." *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 56–57 (2d Cir.1980). *See generally Jefferson Parish*, — U.S. —, 104 S.Ct. 1551.

▆▆ A claim that a tying arrangement is illegal per se eliminates the requirement that the plaintiff show an actual anti-competitive effect. A claim of illegality based on a rule of reason analysis requires a showing of all five elements including actual anti-competitive effect. *Jefferson Parish*, — U.S. at —, 104 S.Ct. at 1568.

▆▆ Two *separate* products are tied together if a difference exists in the "character of the demand for the two items." *Jefferson Parish*, — U.S. at —, 104 S.Ct. at 1562 (citing *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953)). Amey claims that Lee County Bank, in agreement with Henderson, requires customers seeking mortgage financing from Lee County Bank to pay for the legal services of Henderson as well. We agree with the district court that the mortgage financing and the legal services were not purchased separately. Furthermore, the former Fifth Circuit has held that where a bank passes on to the borrower its attorney's fees pursuant to a mortgage finance transaction, such is not an antitrust violation. *See Sibley v. Federal Land Bank of New Orleans*, 597 F.2d 459, 461, 464 (5th Cir.), *cert. denied*, 444 U.S. 941, 100 S.Ct. 296, 62 L.Ed.2d 308 (1979). *See also Forrest v. Capital Buildings & Loan Assn.*, 504 F.2d 891, 891 (5th Cir.1974), *cert. denied*, 421 U.S. 478, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975) ("this method of doing business does not constitute a sale of two products or a violation of the tied product prohibition of the antitrust laws").

An additional observation is necessary regarding the tying arrangement claim. The fifth requirement for a tying arrangement claim is that a "not insubstantial" amount of interstate commerce be involved. While we have held that an individual consumer may have standing to sue on the facts involved in this case, only an individual consumer involved in a transaction with substantial impact on interstate commerce can satisfy the fifth element of the tying antitrust claim so as to survive summary judgment. *See Jefferson Parish*, — U.S. —, —, 104 S.Ct. 1551, 1560 ("if only a single purchaser were forced" with respect to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of antitrust law. It is for this reason that we have refused to condemn tying arrangements unless a substantial volume of commerce is foreclosed thereby."). The $325 fee, or more specifically, the difference between the price of title services in an unrestrained market and in the alleged restrained market is not a substantial impact on interstate commerce. Accordingly, we hold that Amey has failed to carry its burden of proffering significant evidence of the existence of genuine issues of fact as to the tying arrangement claim.

II. Exclusive Dealing Claim

▆▆ In the absence of conduct causing a restraint of trade or the effectuation of a monopoly, an individual has unfettered discretion in deciding with whom he will do business. *Moore v. New York Cotton Exchange*, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926); *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). *See also Monsanto Company v. Spray-Rite Service Corp.*, — U.S. —, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) (a manufacturer generally has a right to deal or refuse to deal with whomever it likes, as long as it does so independently). *See also Six Twenty-Nine Productions, Inc. v. Rollins Telecasting, Inc.*, 365 F.2d 478 (5th Cir.1966). Amey alleges that Lee County Bank agreed that Henderson would supply all of its required real estate legal services.

Amey does not, however, provide any evidence as to the anti-competitive effect of this exclusive dealing arrangement. Absent evidence of anti-competitive effect, Amey's exclusive dealing claim does not generate a genuine issue of fact. Accordingly, the district court did not err in granting summary judgment on this claim.

### III. Price Fixing Claim

■■■■ Certain types of business agreements are deemed to be unreasonable as a matter of law. "A price fixing agreement between competitors is the classic example of such an arrangement." *Jefferson Parish*, — U.S. —, —, 104 S.Ct. 1551, 1556 (citing *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 343–48, 102 S.Ct. 2466, 2472–75, 73 L.Ed.2d 48 (1982)).

> [F]or over forty years this Court has consistently and without deviation adhered to the principle that price fixing agreements are unlawful per se under the Sherman Act and that no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense.

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218, 60 S.Ct. 811, 842, 84 L.Ed. 1129 (1939). The gravamen of the price fixing claim, therefore, is the existence of an *agreement* in which the coconspirators manipulate market prices.

■■■ In its Motion in Opposition to Defendants Motions for Summary Judgment, Amey identified twelve "evidentiary acts" supporting its claims. Those relevant to the price fixing and exchange of price information claims include (1) the "periodic circulation of price lists including attorney's fee among the several defendants," (2) the law firm's "use of the same or uniform methods for arriving at charges for the various services," (3) the bank's refusal to permit attorneys other than their own to represent borrowers, and (4) Lee County attorneys' creation of Gulf Abstract, (5) the vertical interlocking business relationships among the banks and law

firms, (6) the refusal to permit other attorneys to appear and participate in a closing of the mortgage loan transaction on behalf of their client purchaser, and (7) the failure of the banks to inform the purchaser of his right to have independent legal representation in the mortgage loan transaction.

Amey argues that the prevailing rule regarding proof of price fixing in the absence of direct evidence is the offering of circumstantial evidence of parallel pricing conduct plus other factors tending to show concerted action. Amey cites as authority this circuit's decision in *Southway Theatres, Inc. v. Georgia Theatre Co.*, 672 F.2d 485 (5th Cir.1982) where we interpreted the Supreme Court's decision in *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), to hold that a plaintiff survives a motion for summary judgment on a claim of refusal to deal where plaintiff proffers circumstantial evidence of parallel behavior plus "other evidence besides the simple failure to deal." *Southway Theatres, Inc. v. Georgia Theatre Company*, 672 F.2d at 494 (quoting *Cities Service*, 391 U.S. at 280, 88 S.Ct. at 1588).

*Southway Theatres* is of little help to Amey. First, even under Amey's understanding of *Southway*'s holding, the evidentiary acts recited above do not constitute "other evidence." In the *Southway* view, the phrase means "evidence other than those facts which are the foundation for [the] allegation of a refusal to deal." *Southway Theatres*, 672 F.2d at 495. All of Amey's pieces of "other evidence" are integrally related to the allegations of its cause of action. Second, *Southway* holds that additional evidence of concerted action must be put forth, but does not suggest that the examples it includes are the only kind of acceptable additional evidence. The former Fifth Circuit construed the "other evidence" provision in *Aviation Specialties, Inc. v. United Technologies Corp.*, 568 F.2d 1186 (5th Cir.1978). The former Fifth Circuit interpreted *Cities Service* as requiring an additional evidentiary showing from a plaintiff who relies on circumstan-

tial evidence of parallel business behavior to prove concerted action.

Proof of parallel business behavior does not establish a violation of the Sherman Act; therefore, to avoid summary judgment ASI had to come forward with significant probative evidence supporting its theory that the defendants engaged in (1) consciously parallel action, (2) which was contrary to their economic self interest so as not to amount to a good faith business judgment. *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537 [74 S.Ct. 257, 98 L.Ed. 273] (1954).

*Aviation Specialties*, 568 F.2d at 1192. *See Paul Kadair, Inc. v. Sony Corp. of America*, 694 F.2d 1017, 1027 (5th Cir. 1983); *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 559 (5th Cir.1980). Amey has not shown through its identification of the seven evidentiary acts that the banks and law firms have acted against their "economic self-interest." The district court did not err in granting summary judgment for the banks and law firms on the price fixing claim.

IV. Exchange of Price Information

▆ Amey alleges in Count II of its complaint that the circulation of Gulf Abstract's title insurance rate cards was an exchange of price information with the foreseeable effect of restraining trade. The district court granted summary judgment on this claim because of the absence of any evidence of an agreement. We agree with the district court.

▆ The exchange of price information among competitors is not a per se violation of the antitrust laws. *Memorial Park Cemetery Association v. Rosebrough Monument Co.*, 457 U.S. 1111, 102 S.Ct. 2915, 73 L.Ed.2d 1321 (1981). "Absent an agreement to fix prices, there is nothing unlawful about competitors meeting and exchanging price information or discussing problems common in their industry, or even exchanging information as to the cost of their product." *Rutledge v. Electric Hose and Rubber Co.*, 327 F.Supp. 1267, 1272

(C.D.Cal.1971), *aff'd* 511 F.2d 668 (9th Cir. 1975). *See also United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). Amey provides no evidence other than the evidentiary acts identified earlier, including the circulation of the Gulf Abstract title insurance card. As we found in the previous discussion of the price fixing claim, Amey's evidentiary acts are insufficient to raise a reasonable inference of the existence of a genuine issue of fact that appellees engaged in concerted horizontal activity.

### PREMATURE TERMINATION OF DISCOVERY CLAIM

▆ Amey contends that the district court improperly limited discovery and, therefore, precluded it from discovering adequate evidence to oppose the motion for summary judgment. *See Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 548 (5th Cir.1980). *See also First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). Review of the record makes it apparent that Amey was provided more than an adequate opportunity to engage in discovery on all issues raised in its complaint and to bring motions to compel answers and the production of documents. A trial court has wide discretion in determining the scope and effect of discovery. *Pan-Islamic Trade Corp.*, 632 F.2d at 550. In light of the nature of the cumulative and vague allegations in this case, the district court did not abuse its discretion in curtailing discovery pending its hearing on the motions for summary judgment.

The complaint in this case was filed on November 20, 1980. The banks and law firms answered in a timely fashion. Amey thereupon propounded its first set of interrogatories. The general response from the banks and law firms was that these interrogatories were vague and oppressive. Amey then filed a motion to compel answers to its first set of interrogatories and to compel production of documents. This motion was heard by the district court on June 25, 1982. At this hearing, Amey ex-

plained that the theory of its case was "market control by the collective actions of the several defendants in concert one with the other thereby, of course, precluding bona fide competition and excluding others from the ability to engage in this market freely." Amey argued that the unanswered interrogatories would reveal the "identity of material witnesses as it bears upon monopolization as well as conspiracy." The banks and law firms responded that throughout the eighteen months since the filing of the complaint, Amey's discovery failed to reveal any evidence indicating the existence of a conspiracy agreement, an element essential to all the claims. In response to interrogatories propounded by the Lee County Bank, Amey identified T. Rankin Terry, a lawyer in Lee County, as a source of evidence of the existence of a conspiracy agreement. Terry, deposed over a period of two and one-half days, denied any knowledge of the existence of a conspiracy. Amey disputed this assertion, and explained that, indeed, Terry testified that he had "common knowledge" that exclusive agreements existed between the banks and the law firms. The banks and law firms noted that they had conceded for the purposes of summary judgment the existence of parallel prices and parallel processing of commercial mortgages. Nonetheless, in their view, no basis existed for finding that Amey's interrogatories would reveal the existence of such an agreement, especially where Amey's star witness denied actual knowledge of the existence of such an agreement. The district court denied Amey's motion to compel discovery, stayed all discovery except depositions that had already been noticed, and scheduled a date for hearing on the summary judgment motions.

■ A party does not have an unlimited right to discovery prior to a hearing on a motion for summary judgment.

When the record becomes clear enough to disclose that further discovery is not needed to develop significant aspects of the case and that such discovery is not likely to produce a genuine issue of material fact, discovery should be ended. *Universal Brands, Inc. v. Philip Morris, Inc.*, 546 F.2d 30, 36 (5th Cir.1977); *Littlejohn v. Shell Oil Co.*, 483 F.2d 1140, 1145 (5th Cir.1973).

*Aviation Specialties, Inc. v. United Technologies Corp.*, 568 F.2d 1186, 1190 (5th Cir.1978).

The district court was correct in suggesting that the gravamen of Amey's theory of the case is the existence of an agreement. Amey seeks to discover additional circumstantial evidence of concerted activity, but is unable to identify any additional evidence to be obtained through discovery. Amey argues that the object of the interrogatories was to discover the names of people who were witnesses to the concerted practices. This objective, in Amey's view, is achieved by interrogatories requesting specifics about commercial real estate sales closings. As the district court noted, the most that can be obtained through these interrogatories is mere cumulative evidence of parallel pricing and processing, matters which the banks and law firms have conceded. We hold that the district court did not abuse its discretion in curtailing discovery pending a hearing on the motions for summary judgment.

## ATTORNEY'S FEES

Subsequent to the grant of summary judgment as to all of Amey's claims, the banks and law firms moved in district court to have attorney's fees awarded against Amey under 28 U.S.C.A. § 1927 (Supp. 1984) and Fla.Stat. § 57.105 because Amey initiated and conducted its litigation in bad faith.[9] The claim of bad faith is based on

9. Title 28 U.S.C.A. § 1927 provides:
   Any attorney or other person admitted to conduct cases in any court of the United States or any territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to

   satisfy personally the excess costs, expenses, and attorneys fees reasonably incurred because of such conduct.
   Fla.Stat. § 57.105 provides:
   The court shall award a reasonable attorney's fee to the prevailing party in any civil action

Amey's (1) suing many entities when damages were only $325, (2) pursuing the same claims in federal court that were resolved against Amey in the state court, (3) initiating litigation based on the hearsay statements of Terry as to the existence of a horizontal agreement among the banks and law firms, and continuing the litigation even after Terry admitted having no actual knowledge of the existence of an agreement, (4) rejecting settlement offers, (5) inclusion of Exchange Bank as a defendant based only on the mistaken belief that it was one of the four top banks in Lee County, and the decision not to drop Exchange Bank from the suit when it was discovered that Exchange Bank is not one of the four top banks, (6) suing the wrong law firm, Alderman and Taminosian, and the decision not to drop the law firm from the suit when it was discovered that the "Frank Alderman" to whom T. Rankin Terry referred in his discussions with Amey was deceased, and (7) pressing of the baseless claim that the banks and law firms improperly participated in promulgation of supreme court rules placing the provision of title services within the restrictions of authorized practice of law. The banks and law firms contend that the district court abused its discretion in failing to tax attorney's fees against Amey under section 1927, the bad-faith exception, and Fla.Stat. § 57.105.

■ The application of section 1927 to this case is controlled by the Supreme Court's decision in *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980). In *Roadway Express*, attorneys for plaintiffs in a civil rights class action against a Louisiana corporation failed to comply with district court orders relating to discovery and the filing of briefs. The district court read "costs" in section 1927 as including the award of attorney's fees "as part of the costs" of litigation contemplated by 42 U.S.C.A. §§ 1988 and 2000e–5(k). The Fifth Circuit

reversed, and the Supreme Court held that attorney's fees are not includable as "costs" under 28 U.S.C.A. § 1927. The Court held, nonetheless, that in certain circumstances, a district court has the inherent power to award attorney's fees:

[T]he general rule in federal courts is that a litigant cannot recover his counsel fees. *See Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S., [240] at 257, 44 L.Ed.2d 141, 95 S.Ct. 1612. But that rule does not apply when the opposing party has acted in bad faith. In *Alyeska* we acknowledged the 'inherent power' of courts to

assess attorneys' fees for the 'willful disobedience of a court order ... as part of the fine to be levied on the defendant ... or when the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.... [*Alyeska Pipeline*, 421 U.S. at 258–259 [95 S.Ct. at 1622]].....

The bad faith exception for the award of attorney's fees is not restricted to cases where the action is filed in bad faith. "'(B)ad faith' may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation." [Citation omitted.]

*Roadway Express*, 447 U.S. at 765–66, 100 S.Ct. at 2464. This circuit adheres to the *Roadway Express* principle that "in narrowly defined circumstances, federal courts have inherent power to assess attorney's fees against counsel." *Durrett v. Jenkins Brickyard, Inc.*, 678 F.2d 911, 918 (11th Cir.1982). *See Rothenberg v. Security Management Co.*, 736 F.2d 1470, 1471 (11th Cir.1984).

■ Once having granted summary judgment on the federal claims, the district court also granted summary judgment on the state claims based on generalized principles of estoppel. The banks and law firms claim that they should be awarded attorney's fees because Amey's cause of action was completely absent of a "justicia-

in which the court finds that there was a complete absence of a justiciable issue of ei-

ther law or fact raised by the losing party.

ble issue of either law or fact." Florida courts have consistently held that in order for an action to be devoid of merit so as to not have a justiciable issue the claims must be "frivolous." *Nunes v. Margate General Hospital, Inc.,* 435 So.2d 916 (Fla.Dist. Ct.App.1983); *Cusick v. Condominium Marketing Consultants, Inc.,* 434 So.2d 25 (Fla.Dist.Ct.App.1983); *Angora Enterprises v. Condominium Association of Lakeside Village, Inc.,* 432 So.2d 792 (Fla.Dist. Ct.App.1983); *Southeast First Leasing, Inc. v. Koontz,* 431 So.2d 333 (Fla.Dist.Ct. App.1983); *Strothman v. Henderson Mental Health Center, Inc.,* 425 So.2d 1185 (Fla.Dist.Ct.App.1983). The trial court must make a specific finding of "complete absence of a justiciable issue of either law or fact" or face reversal or remand on the award of attorney's fees. *Whitten v. Progressive Casualty Insurance Co.,* 410 So.2d 501, 505 (Fla.1982); *Apgar & Markham Construction v. Macasphalt, Inc.,* 424 So.2d 41 (Fla.Dist.Ct.App.1982). *See also Burger King Corp. v. Mason,* 710 F.2d 1480 (11th Cir.1983).

▄▄▄ The banks and law firms also claim an entitlement to attorney's fees under Florida law because Amey initiated and conducted the litigation in bad faith. The bad faith exception to the American rule that parties bear their own costs, including attorney's fees, applied to the federal courts by *Roadway Express,* is not recognized in Florida jurisprudence. *Department of Revenue of the State of Florida v. Arga Co.,* 420 So.2d 323 (Fla.Dist.Ct.App. 1982). In *Arga,* the state of Florida failed to obey a court order compelling discovery. The state suffered a default judgment and the prevailing party received attorney's fees based on the state's bad faith litigation. The Fourth District Court of Appeals of Florida reversed. While regarding the applicability of *Roadway Express*'s bad faith exception to state courts, it explained:

> To our knowledge, no Florida appellate court has addressed the question of whether Florida follows the 'bad faith' exception to the general rule that a litigant cannot recover his counsel fees.

The Fifth Circuit, however, did address the question in *Perkins State Bank v. Connolly,* 632 F.2d 1306 (5th Cir.1980). There, the court held:

> [Florida does] not accept the federal 'bad faith' exception to the American rule. To be sure, the Florida Supreme Court has recognized that a limited right to recover attorney's fees may exist in cases of 'fraud or malice':
>
>> The right to recover attorneys' fees as part of the costs did not exist at common law. It must be provided by statute or contract. Fraud or malice may modify the rule under circumstances.
>
> This exception has been narrowly interpreted and seems limited to cases where the fraud or malice is 'specific, certain and conclusive.'
>
> ... More importantly, this exception does not appear to allow attorney's fees as an element of costs.

*Id.,* at 1311–12 (citations omitted). We concur with the foregoing analysis.

*Department of Revenue of the State v. Arga,* 420 So.2d 323, 324 (Fla.Dist.Ct.App. 1982), *petition for review denied,* 434 So.2d 886 (Fla.1983).

Review of the attorney's fees issue requires that we determine whether, as to the federal antitrust claims, the banks and law firms are entitled to costs, identified in 28 U.S.C.A. § 1920, under section 1927 because Amey "unreasonably and vexatiously" multiplied the costs of the proceedings, or whether Amey is entitled to attorney's fees under the bad faith litigation exception of *Roadway Express.* As to the state antitrust claims, we must determine whether the banks and law firms are entitled to attorney's fees under Fla.Stat. § 57.105 because Amey's cause of action demonstrated "a complete absence of a justiciable issue of either law or fact," or under the "fraud or malice" exception recognized by Florida law.

The banks and law firms identified seven circumstances which they contend support a finding that the trial court abused its

discretion in denying the award of attorney's fees.

## I. Scope of Damages.

The banks and law firms contend that because the only alleged injury to Amey is the $325 fee for the services of Henderson, proceeding to court with such a minimal injury constitutes bad faith. Nowhere in Section 4 of the Clayton Act is a minimal injury requirement mentioned. Congress has specifically declined to require any threshold level for a jurisdictional "amount in controversy." *See* 15 U.S.C.A. § 15(a) (Supp.1984). Accordingly, while the actual amount of the injury might be relevant to the ability to show anti-competitive effect under a rule of reason analysis, *see Jefferson Parish*, —— U.S. ——, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), the dollar amount of the injury alleged is not relevant to the grant of attorney's fees.

## II. Res Judicata.

The banks and law firms also claim that Amey's suit was barred by the prior litigation of the same claims in the state court. In the state proceeding, Amey sued Henderson and its insurer, Gulf Insurance Company, claiming damages of $2,500 for Henderson's negligence in not detecting the lien placed on the Hogue property by the Internal Revenue Service. The circuit court granted summary judgment against Amey, finding that "no attorney-client relationship existed" between Henderson and Amey and that Henderson "owned no legal duty" to Amey. The Second District Court of Appeals of Florida held (1) that Amey was not a third-party beneficiary of the contract between Lee County Bank and Henderson and (2) the transaction with Lee County Bank did not create an attorney-client relationship between Henderson and Amey. *Amey, Inc. v. Henderson, Franklin, Starnes & Holt, P.A.*, 367 So.2d 633 (Fla.Dist.Ct.App.1979). In its complaint in this case, Amey claims an injury of $35,000 based on a variety of antitrust violations caused by a number of banks, law firms, in addition to Henderson, and a title insurance company.

The threshold question in deciding whether the trial court abused its discretion in failing to grant attorney's fees under the various standards based on relitigation of an already decided cause of action is whether the federal doctrine of *res judicata* or that of Florida is to control. Where the first suit is brought in state court and the second suit is brought in federal court based on diversity, state law of *res judicata* is to be applied. *Commercial Box & Lumber v. Uniroyal*, 623 F.2d 371, 373 (5th Cir.1980); *Cleckner v. Republican Van & Storage Co.*, 556 F.2d 766, 768 (5th Cir.1977). Similarly, when a federal court exercises federal question jurisdiction and is asked to give *res judicata* effect to a state court judgment, it must apply the *"res judicata* principles of the law of the state whose decision is set up as a bar to further litigation." *Hernandez v. City of Lafayette*, 699 F.2d 734, 736 (5th Cir.1983) (citing *ED Systems Corp. v. Southwestern Bell Telephone Co.*, 674 F.2d 453, 457 (5th Cir.1982)). *See Marrese v. American Academy of Orthopaedic Surgeons*, —— U.S. ——, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985). *See also St. John v. Wisconsin Employment Relations Board*, 340 U.S. 411, 71 S.Ct. 375, 95 L.Ed. 386 (1951); *Rollins v. Dwyer*, 666 F.2d 141 (5th Cir.1982). The Florida doctrine of *res judicata* bars subsequent litigation where there is (1) identity of the thing sued for, (2) identity of the cause of action, (3) identity of persons and parties to the actions, and (4) identity of the quality or capacity of the person for or against whom the claim is made. *Stevens v. Len-Hal Realty, Inc.*, 403 So.2d 507, 508 (Fla.Dist.Ct.App.1981); *Seaboard Coastline Railroad v. Industrial Contracting Co.*, 260 So.2d 860 (Fla. Dist.Ct.App.1972).

The first requirement is satisfied. In the prior action, Amey sued for $2,500 in damages. In this action, Amey sues for $35,000 in damages. Identity of the thing sued for exists—damages. *See Valdes v. Ruiz*, 354 So.2d 1269 (Fla.Dist.Ct.App. 1978).

There is not, however, identity of cause of action. For that second requirement to be satisfied, the law

> requires ... that the claims or causes of action be substantially the same.... Identity of causes of action is defined by similarity of the facts essential to the maintenance of both actions. *Gordon v. Gordon,* 59 So.2d 40 (Fla.1952); *Smith v. Florida East Coast Railway Company,* 151 So.2d 70 (Fla. 3d DCA 1963).

*Pumo v. Pumo,* 405 So.2d 224, 226 (Fla. Dist.Ct.App.1981). In the state court action, the essential facts focused on the reliance of Amey on the title opinion prepared by Henderson. The second action, however, included not only the facts of Amey's reliance, but focused more on the existence of an "agreement" among the banks and the law firms in Lee County to restrain the trade in title services. The proof of an agreement was not "essential" to the maintenance of a negligence action in the first state action, but is indispensable to Amey's antitrust action.

We hold, therefore, that the Florida doctrine of *res judicata* does not bar this action begun in federal court, and the district court did not abuse its discretion in failing to grant attorney's fees under the various standards.[10]

### III. Remaining Circumstances.

None of the remaining circumstances, either individually or together, support a finding of bad faith, vexatiousness, complete absence of a justiciable issue, or fraud, or malice. We agree with the view of the district court that Amey was entitled to an opportunity to substantiate its case for only so long as a reasonable expectation existed that it could do so. In reviewing the conduct of this litigation, we must be mindful of the exigencies under which all parties labor and of which the district court was aware when it ruled on the motion for award of attorney's fees.

I do not find that the plaintiffs—that the defendants are entitled to recover attorneys' fees against counsel for the plaintiffs, either one of them, or to recover for any excess costs against either. While, as I say, the case was a kind as might be vexing, it was not vexatiously brought, nor was it brought without some basis. I do not find that there was a complete absence of justiciable issue of law and fact.

■ We hold that the district court did not abuse its discretion in failing to grant an award of attorney's fees against Amey or its attorneys.

### CONCLUSION

This case presents the model of a single consumer in a large market striving to substantiate its belief that it has been the victim of illegal, anti-competitive conduct. Although Amey was a mere consumer, it had standing to bring these antitrust claims. While its economic interests were in a separate area of the market from that of the banks and law firms, Amey's interests were necessarily intertwined with those of the banks and law firms. Therefore, Amey suffered an injury within the target market. Amey's inability to demonstrate existence of a genuine issue of fact does not suggest that its claims were frivolous but demonstrates the almost inherent inability of a single consumer, only having access to information to which consumers are usually given access, to litigate an antitrust claim effectively. While mindful of Amey's good faith efforts to substantiate its claims, and having found that Amey's claims were not barred by the statute of limitations, we hold that (1) the district court did not abuse its discretion in granting summary judgment for the banks, law

---

**10.** The identity of the persons and parties to the action is easily satisfied on these facts. Henderson was the defendant in the first action and is also the major defendant in the second action, since without the services of Henderson, Amey would not have suffered its alleged injury. Similarly, parties in the second action have maintained a similar identity of capacity as those in the first action: Amey was the mortgagor in both actions and the first action had as defendants the Henderson law firm, while the second action has as defendants law firms and banks providing mortgage financing.

firms, and other parties sued on the tying, exclusive dealing, price fixing, customer allocation, and exchange of information claims, and (2) the district court did not abuse its discretion in denying motions for award of attorney's fees.

Accordingly, the district court is affirmed in both appeals.

AFFIRMED.